Rosalie **BRADFORD** and
Robert S. **Bradford**

v.

**AMERICAN MEDIA OPERATIONS, INC.**

Civ. A. No. 94–6536.

United States District Court,
E.D. Pennsylvania.

April 17, 1995.

---

Nina E. Perris, Philadelphia, PA, for plaintiffs.

Slade R. Metcalf, New York City, Marc J. Zucker, Philadelphia, PA, for defendant.

### MEMORANDUM

DALZELL, District Judge.

American Media Operations, Inc. has moved to dismiss this libel complaint under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment, because it contends this action is time barred under the Uniform Single Publication Act, codified at 42 Pa.Con. Stat.Ann. § 8341. Because the parties have supplemented their briefs with affidavits and a deposition transcript, we shall treat the motion as one for summary judgment. Fed. R.Civ.P. 12(b). For the reasons that follow, we shall grant the motion.[1]

*Factual Background*

#### A. The Article in Question

Defendant publishes a weekly newspaper called *Star*,[2] which some courts with justice have characterized as a tabloid.[3] Rosalie Bradford and her husband, Robert S. Bradford, allege that *Star* published a libelous article (appended to the complaint as Exhibit A), accompanied by three photographs, about them.[4]

---

1. A party who moves for summary judgment must carry the burden of "show[ing] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

 To defeat summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1297 (3d Cir.1993). Instead, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

2. According to the Enquirer/Star Group, Inc.'s June 23, 1994 SEC Form 10–K filing, "Enquirer/Star publishes *National Enquirer, Star, Weekly World News* and *Soap Opera Magazine,* with a current aggregate weekly circulation of approximately 7 million copies. In April 1994 the Company launched its newest publication, *Country Weekly. National Enquirer* and *Star* have the second and third largest single copy circulation, respectively, of any weekly periodical after *TV Guide.* The company derives over 85% of its revenues from circulation, predominantly single copy sales in supermarkets and other retail outlets, and the remainder from advertising and other sources. Enquirer/Star's subsidiary, Distribution Services, Inc. ("DSI"), arranges for the placement of the Company's periodicals in approximately 180,000 locations in the United States and Canada, representing, in the opinion of management, virtually complete coverage of periodical outlets."

3. *See e.g., Star Editorial v. U.S. Dist. Court for Cent. Dist. of Cal.,* 7 F.3d 856, 858 (9th Cir.1993) ("... the petitioner published an article in its weekly tabloid, the Star...."); *Cher v. Forum Int'l, Ltd.,* 692 F.2d 634, 637 (9th Cir.1982) (defendant "publishes, among other things, a tabloid called *Star.*"), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983).

4. The article spells her name "Roselie", not "Rosalie" as it is spelled in the complaint and affidavit.

The article, entitled "I Lost 900 lbs and Learned to Love my Husband Again", depicts Mrs. Bradford as a former "food junkie" who once weighed 1200 pounds—"the weight of a baby elephant or a small family car"[5]—and who was "8 feet wide when she lay down" and had "200 lb. saddlebags on [her] hips that hung down to [her] knees." It describes her life as the "world's fattest woman", "bedridden for nearly 10 years" as a result of her weight, "repulsed" by her own appearance and troubled by daily tasks such as using the bathroom. Mrs. Bradford's weight problem, the story continues, produced a strain on her "physical relationship" with her husband. Mrs. Bradford also reportedly developed a heart condition that brought her to within forty-eight hours of death.

The *Star* story further recounts how Mrs. Bradford subsequently lost nine hundred pounds, making her the "world's top slimmer", after receiving an inspirational phone call from "diet guru", Richard Simmons. As she lost weight, the report states that Mrs. Bradford allegedly resumed sexual relations with her husband. The article claims that Mrs. Bradford had operations to remove the loose skin as she lost weight.

The article is composed almost entirely of quotes attributed to Mrs. Bradford (the story contains only ten unquoted sentences), and includes photographs of her both before and after she lost weight, as well as a photograph of her with Simmons. The Bradfords contend that no one from *Star* ever interviewed Mrs. Bradford for the article, and they take particular offense at six quotes, which they contend are "false and untrue and greatly upset" them.[6]

On September 6, 1994, the Bradfords filed a praecipe for writ of summons against Enquirer/Star, Inc. in the Court of Common Pleas of Philadelphia County, Pennsylvania.[7] Notice of Removal, ¶ 1 & Exhibit A. Enquirer/Star, Inc. was served on October 12, 1994 and removed the action to this Court on October 27, 1994, based upon our diversity jurisdiction. *Id.*, ¶¶ 2, 4. The Bradfords filed their three-count complaint about two weeks after removal.[8] Counts I and II of the complaint are claims by Rosalie Bradford for libel and invasion of privacy, respectively. Count III is a claim by Robert Bradford for invasion of privacy.

### B. *Distribution of the Newspaper*

The *Star* edition containing the allegedly defamatory article, the 36th issue that year, has a cover date[9] of September 7, 1993.

---

5. For the curious, we note that the average weight of a newborn Asiatic elephant is 220 pounds; a newborn African elephant weighs between 250 to 320 pounds. 6 The World Book Encyclopedia, *Elephant* 179 (1982); Michael Bright, *Project Wildlife: Elephants* 30 (1989). An American-made family car, such as the Chevrolet Cavalier, weighs approximately 2,490 pounds. Consumer Reports Books, *New Car Buying Guide 1993 Edition* 187 (Bill Hartford ed. 1993).

6. The quotes are: (1) "I had to learn to love Bob all over again"; (2) "We've started having a physical relationship again. We began by holding hands and kissing and things slowly took their course."; (3) "When we made love for the first time after all those years, I sobbed my heart out with happiness."; (4) "I felt like a real woman again."; (5) "Even going to the bathroom was a nightmare. I had a commode by the bed and Bob would haul me into a sitting position and then maneuver me toward it inch by inch."; and (6) "I would weep for hours. Bob sat and held my hand, but I pushed him away because I was repulsed by my appearance." Complaint, ¶ 14(a)–(f) & Exhibit A.

7. Notwithstanding their choice of venue, the Bradfords reside in Sellersville, in Bucks County, Pennsylvania.

8. Originally, the Bradfords sued Enquirer/Star, Inc. On November 21, 1994, American Media, Inc. and its wholly-owned subsidiary, American Media Operations, Inc., announced the completion of a $200,000,000 leveraged buyout. The press release announcing the deal states that Enquirer/Star, Inc. had changed its name to American Media Operations, Inc. just three days earlier. Since the complaint was filed, the parties have stipulated, and we have approved, the substitution of American Media Operations, Inc. for Enquirer/Star, Inc. as the defendant in this action.

9. By "cover date", we mean the date that appears at the top of the newspaper. American Media Operations refers to the cover date as the "off-sale date or the suggested date upon which the magazine is to be removed from the newsstands." Affidavit of Richard E. Smith ("Smith Aff."), appended to Motion, ¶ 7. *Star*'s cover date always falls on a Tuesday. *Id.* Editions of *Star* are thus available for purchase well before the cover date.

Complaint, ¶ 9. American Media Operations, Inc. sold 425,418 subscription copies of its September 7, 1993 issue of *Star* and 2,577,-817 retail copies, for a total paid circulation of 3,003,235. December 31, 1993 Audit Bureau of Circulations Statement, appended to Motion as Exhibit B.

All of the writing and editing for each issue of *Star* is completed during the week before that issue is placed on the newsstands for purchase. Smith Aff., ¶ 2. The final copy is delivered to regional printing presses located throughout the country. *Id.* Copies of *Star* that are distributed throughout Bucks County, Pennsylvania and the surrounding area are printed by Quebecor Printing in Atglen, Pennsylvania. *Id.*, ¶ 10. Printing is usually completed by Friday of each week, at which time copies are ready to be delivered to the public. *Id.*, ¶ 2. For the September 7, 1993 issue, Quebecor began printing on Wednesday, August 25 and finished on Friday, August 27, 1993. *Id.*, ¶ 10.

Subscription copies are shipped by United States Postal Service second class mail from the regional printing presses directly to the customer. *Id.*, ¶ 3. Subscription copies are delivered to the Postal Service the Friday before the week that single copy sales are made available to the public. Since the Postal Service is said to take, on average, between one to four days to deliver the issues, most of the subscribers receive their copies by Tuesday each week. *Id.* On Thursday, August 26, 1993, Quebecor shipped 53,798 subscription copies of the September 7, 1993 edition to a mailing service, Advertiser Mailers, Inc., in Trenton, New Jersey, who, in turn, delivered the copies to the United States Postal Service in Trenton the following day. *Id.*, ¶ 11.

A small number of single copy issues are distributed by mail galley wholesalers who accept orders and returns from newsstand proprietors but do not distribute copies of *Star* themselves. *Id.*, ¶ 6. Mail galley wholesalers deliver their copies of *Star* to the newsstands through the mail in the same manner as individual subscribers. *Id.* For example, TV Readers Service, a mail gallery wholesaler in Lenoir City, Tennessee, that services a small number of newsstands in Bucks County, mailed three copies of the September 7, 1993 issue to the Sellersville Pharmacy, which, applying the four-day delivery time, should have received them on Monday August 30, or Tuesday, August 31, 1993 at the latest. *Id.*, ¶ 15.

Most single copy issues are shipped from the printing presses to regional wholesalers, who then deliver them to newsstands and retail stores. *Id.*, ¶ 5. The wholesalers receive their copies of *Star* just prior to the week that they are put on the newsstand, and actually deliver the papers on the following Monday and Tuesday. *Id.* In the Bucks County area, Quebecor Printing delivers the papers to Highway Film Delivery, who then transports them to three different wholesale distributors. *Id.*, ¶ 12. On Friday, August 27, 1993, Highway Film Delivery transported 70,100 copies of the September 7, 1993 *Star* issue to Levy United News Co., 10,300 copies to Valley Distributor, Inc. and 9,500 copies to Allentown News Agency, Inc. *Id.*, ¶ 13; Motion Exhibits D, E and F.

Jim Smolen, the Director of Operations at Levy United News Co., averred in his affidavit and testified at his deposition that Highway Film Delivery transported copies of the September 7 edition to Levy's warehouse on Friday, August 27, 1993. Affidavit of Jim Smolen ("Smolen Aff."), appended to Motion, ¶¶ 3–4; January 30, 1995 Deposition of James Smolen ("Smolen Dep."), appended to Response at 9. Levy employees "picked" (separated and bundled) the copies that were destined for each newsstand and delivered them to various newsstands in the area from Monday, August 30 to Wednesday, September 1, 1993. Smolen Dep. at 12; Smolen Aff., ¶¶ 3–4. Tom Olbrich, Vice–President of Valley Distributors Inc., and R.F. Lentz, President of Allentown News Agency, Inc., both stated in their affidavits that their companies follow nearly identical procedures. Affidavit of Tom Olbrich, appended to Motion, ¶¶ 3–4; Affidavit of R.F. Lentz, appended to Motion, ¶¶ 3–4.

The individual newsstand proprietors complete the sales process. David McCool, owner and manager of Nite Owl News located at Broad and Locust Streets in Philadelphia, confirmed that Levy United News delivers

all of the copies of *Star* on Monday each week. Verification of David McCool ("Defendant's McCool Ver."), appended to Motion, ¶ 2; Verification of David McCool ("Plaintiffs' McCool Ver."), appended to Response, ¶ 2.[10] McCool and his staff then remove any remaining copies of *Star* from the newsstand and replace them with copies of the new issue. *Id.* Based upon this practice, McCool states that the September 7, 1993 issue of *Star* was available for purchase at Nite Owl News on Monday, August 30, 1993. Defendant's McCool Ver., ¶ 3; Plaintiffs' McCool Ver., ¶ 3. McCool goes on to add that the September 7, 1993 issue of *Star* remained on his stand until Tuesday, September 7 rather than Monday, September 6, 1993 because September 6 was Labor Day and Levy United News did not deliver on the holiday. Plaintiffs' McCool Ver., ¶¶ 4, 6. Stanley Schiffman, President of Bradd Alan Bookstores, Inc. located at 30th Street Station in Philadelphia, Richard Singer, franchisee of a 7–Eleven in New Britain, Bucks County, and Jaimini Patel, owner of a 7–Eleven in Doylestown, Bucks County all verified (much as McCool did) that the September 7, 1993 issue was available for purchase by Tuesday, August 31, 1993, at the latest. McCool has further verified that the issue in question remained on his newsstand until September 7, 1993. Plaintiff's McCool Ver., ¶ 7.

Thus, American Media Operations, Inc. has introduced uncontroverted evidence, in the form of affidavits, that the September 7, 1993 edition of *Star* was made generally available to the Pennsylvania public on August 31, 1993, or, at the latest, September 1, 1993. American Media Operations contends that it follows as a logical conclusion that the Bradford's suit is barred by the applicable one-year statute of limitations since plaintiffs did not file suit until September 6, 1994. The Bradfords agree that the September 7, 1993 *Star* issue "was available to the public from August 30, 1993, at the earliest", Response at 2, and have also introduced undisputed evidence that this issue remained available on at least some newsstands for purchase until, at least, its retrieval (or disposal) on September 7, 1993.

In opposing this motion, the Bradfords advance three arguments why their suit should not be time-barred. First, the plaintiffs argue that they can choose any single publication of the September 7, 1993 edition of *Star* as the accrual date of the action. Second, they claim that the discovery rule applies to toll the running of the statute of limitations until the Bradfords first learned, or should have learned, about the offending article.[11] Finally, they contend that the cover date was misleading and they reasonably relied on it, and thus the defendant should be estopped from asserting a statute of limitations defense as a result.

We believe that this case is governed by the Pennsylvania Supreme Court's 1970 decision in *Dominiak v. Nat'l Enquirer,* 439 Pa. 222, 266 A.2d 626 (1970). As we construe that case, the Bradfords may select the last publication date of the September 7, 1993 edition of *Star* in Pennsylvania to support their claims of libel and invasion of privacy. Since the last publication date was September 1, 1993, we shall grant American Media Operations' motion for summary judgment.

*Legal Analysis*

A. *Choice of Law*

 As a federal court in a diversity case, we must of course apply the substantive law of the state which encompasses our district, *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the conflict of law rules of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), here, Pennsylvania. Our *Erie* duty requires us to predict how the Pennsylvania Supreme Court would decide the matters before us. *Kiewit Eastern Co. v. L & R Constr. Co.,* 44

---

10. Each party has submitted a verification by David McCool. The first three paragraphs of each verification are nearly identical to one another, but plaintiffs' version adds four more paragraphs that describe when the September 7, 1993 issue was removed from the newsstand at Nite Owl News.

11. The Bradfords have submitted an affidavit of Rosalie Bradford that she did not learn about the allegedly defamatory article until September 8, 1993. Affidavit of Rosalie Bradford, appended to Response, ¶ 6.

F.3d 1194, 1201 n. 16 (3d Cir.1995). When the Pennsylvania Supreme Court has not addressed an issue, we may look to decisions of the intermediate courts for guidance. *Id.; Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 614 (3d Cir.1992). As the parties recognize, Pennsylvania law applies to this action because the Bradfords reside in the Commonwealth and any harm to their reputation that may have occurred as a result of the *Star* publication would largely center in that state. *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1077 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 and *reh'g denied,* 474 U.S. 1014, 106 S.Ct. 548, 88 L.Ed.2d 477 (1985). In Pennsylvania, statutes of limitations are part of the substantive law. *Menichini v. Grant,* 995 F.2d 1224, 1228 n. 2 (3d Cir.1993).

## B. *Statute of Limitations*

Pennsylvania has a one year statute of limitations for libel and invasion of privacy suits. 42 Pa.Cons.Stat.Ann. § 5523(1) (Supp. 1994). Under the method of computing periods of limitation generally, "[t]he time within which a matter must be commenced under this chapter shall be computed ... from the time the cause of action accrued...." 42 Pa.Cons.Stat.Ann. § 5502(a).

The general rule at common law was that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A, Comment *a* (1977), *cited in Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 n. 3, 104 S.Ct. 1473, 1478 n. 3, 79 L.Ed.2d 790 (1984); *see also,* 50 Am.Jur.2d *Libel and Slander* § 153 (1970); *Gaetano v. Sharon Herald Co.,* 426 Pa. 179, 184, 231 A.2d 753, 756 (1967) ("Under the English and American common law rule, every sale of a single copy of a newspaper was

a distinct publication, giving rise to a separate cause of action."). This "multiple publication" rule appears to have originated in the middle of the last century in the English case of *Duke of Brunswick v. Harmer,* 14 Q.B. 185, 117 Eng.Rep. 75 (1849), in which the court held that each sale of a newspaper was a separate publication to a new person, for which a separate cause of action would lie. Restatement (Second) of Torts § 577A Comment (1977). As the Restatement (Second) recognizes, "[t]his may or may not have been appropriate in 1849, with small communities and limited circulation." *Id.*

With the advent of mass media, however, the common law became anachronistic because a single defamatory statement could give rise to millions of causes of action. Harper, James & Gray, *The Law of Torts* § 5.16 (2d ed. 1986). One newspaper article or television show could produce multiple claims and thus put a massive strain on judicial dockets. Accordingly, many states adapted their common law through the courts with the development of the single publication rule, whereby only one action for damages could be maintained for any single publication of a defamatory statement, regardless of the number of copies in existence. *Id.;* Andrea G. Nadel, Annotation, *What Constitutes "Single Publication" Within Meaning of Single Publication Rule Affecting Action for Libel and Slander, Violation of Privacy, or Similar Torts,* 41 A.L.R.4th 541 § 2 (1985).

Pennsylvania's General Assembly, on the other hand, joined six of its sister states [12] in enacting a form of the Uniform Single Publication Act. Pennsylvania's version of that Act provides, in relevant part:

> No person shall have more than one cause of action for damages for libel or slander, or invasion of privacy, or any other tort founded upon any single publication, or

---

12. The others are Arizona (Ariz.Rev.Stat.Ann. § 12–651 (1982)), California (Cal.Civ.Code §§ 3425.1 to 3425.5 (Deering 1984)), Idaho (Idaho Code §§ 7–702 to 7–705 (1979)), Illinois (Ill. Ann.Stat. ch. 126, paras. 11 to 15 (Smith–Hurd 1987)), New Mexico (N.M.Stat.Ann. §§ 41–7–1 to 41–7–5 (1986)), and North Dakota (N.D.Cent. Code 14–02–10 (1987)). 42 Pa.Cons.Stat.Ann. § 8341 Notes (West Supp.1994).

At least one state, Texas, has judicially adopted the Uniform Single Publication Act. *Holloway v. Butler,* 662 S.W.2d 688, 689 (Tex.Ct.App.1983) ("... we now take the opportunity to adopt the following Uniform Single Publication Act"), *error refused, no reversible error* (1984).

Other states have enacted their own statutes, rather than the Uniform Act. *See e.g.,* Fla.Stat. § 770.06 (1987); Neb.Rev.Stat. § 20–209 (1983).

exhibition, or utterance, such as any one edition of a newspaper, or book, or magazine, or any one presentation to an audience, or any one broadcast over radio or television, or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions. 42 Pa.Cons.Stat.Ann. § 8341(b). This single publication rule generally "reduces the potential serious drain of libel cases on judicial resources. It also serves to protect defendants from harassment resulting from multiple suits. Restatement (Second) of Torts § 577A, Comment *f* (1977)." *Keeton,* 465 U.S. at 777, 104 S.Ct. at 1480.

 On its face, the Uniform Single Publication Act only limits the number of suits a plaintiff may bring on a single publication of defamatory material; it is silent as to when the statute of limitations begins to accrue on a defamation or invasion of privacy claim. Nevertheless, as American Media Operations points out, a number of jurisdictions have interpreted the single publication rule as establishing that the statute of limitations begins to run on the date a publication generally becomes available to the public for purchase.[13]

The Pennsylvania Supreme Court first addressed the Uniform Single Publication Act in *Gaetano v. Sharon Herald Co.,* 426 Pa. 179, 231 A.2d 753 (1967), a libel action brought in Allegheny County against the publisher of a newspaper located in Mercer County. The defendants, relying on the Uniform Single Publication Act, attempted to have the case transferred to Mercer County because the great bulk of the papers were sold there. *Id.,* 426 Pa. at 183, 231 A.2d at 756. The court held that the Act had no

relevance to venue and permitted the suit to remain in Allegheny County, but did not discuss the applicability of the Act to any statutes of limitations. *Id.*

Three years after *Gaetano,* the Pennsylvania Supreme Court had occasion to revisit the Uniform Single Publication Act in *Dominiak v. Nat'l Enquirer,* 439 Pa. 222, 266 A.2d 626 (1970), in which a minor, through his guardian, brought suit for libel against *Star*'s sister paper, *National Enquirer. See* n. 2, *supra.* Defendants moved for summary judgment on the ground that the cause of action was barred by the statute of limitations. *Dominiak,* 439 Pa. at 223, 266 A.2d at 627.

The uncontroverted evidence established that the March 29, 1964 *National Enquirer* issue was printed in Tenafly, New Jersey beginning on March 10, shipped to railroad terminals for distribution the same day, delivered to newsstands in New York on March 12, and made available for purchase on newsstands in New York City on March 13 and in Philadelphia on March 14, 1964. *Id.,* 439 Pa. at 224, 266 A.2d at 627. The issue remained on sale for one week when the remaining unsold copies were removed and replaced with the following week's edition. *Id.* Plaintiff brought suit on March 15, 1965. *Id.,* 439 Pa. at 224, 266 A.2d at 628. The Superior Court held that the suit was barred because the publication appeared for the first time in Philadelphia on March 14, 1964 and plaintiff brought suit in Pennsylvania one year and a day later. As the Supreme Court found and the defendants conceded, however, this conclusion was a clear error under Pennsylvania law because March 14, 1965 was a Sunday, and thus a day of grace was automatically

---

**13.** Motion at 6 (citing *Morrissey v. William Morrow & Co.,* 739 F.2d 962, 969–70 (4th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 340 (1985); *Fleury v. Harper & Row Publishers, Inc.,* 698 F.2d 1022, 1027 (9th Cir.), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *Zuck v. Interstate Publishing Corp.,* 317 F.2d 727 (2d Cir.1963); *Wildmon v. Hustler Magazine, Inc.,* 508 F.Supp. 87, 91 (N.D.Miss.1980); *Khaury v. Playboy Publications, Inc.,* 430 F.Supp. 1342, 1344 (S.D.N.Y.1977); *Ault v. Hustler Magazine, Inc.,* 1986 WL 20896, 13 Media L.Rep. (BNA) 1657, 1660 (D.Or.1986); *Goodlett v. New York Magazine Co.,* 11 Media L.Rep. (BNA) 2138, 2139 (Cal Ct.App.1985); *McGuiness v. Motor Trend Magazine,* 129 Cal. App.3d 59, 62, 180 Cal.Rptr. 784, 785 (1982)); *see, also,* Robert A. Brazener, Annotation, *What Constitutes "Publication" of Libel in Order to Start Running of Period of Limitations,* 42 A.L.R.3d 807, § 6 (1972 & 1994 Supp.) (collecting cases); 53 C.J.S. *Libel* § 53 (1987) ("Under the single publication rule, the right of action accrues at the single date of first publication. Publication, for such purposes, is complete on the last day of mass distribution of the printed matter rather than the date printed on the cover of the publication." (footnotes omitted)).

extended. *Id.* Defendants therefore argued that the statute of limitations began to accrue on March 10, 1964, when the copies were shipped to the railroad terminals, or, at the latest, on March 12, 1964, when the papers were available for sale in New York. *Id.,* 439 Pa. at 224–25, 266 A.2d at 628.

The Pennsylvania Supreme Court began its analysis by "examin[ing] the conditions that led to the passage of the Uniform Single Publication Act". *Id.,* 439 Pa. at 225, 266 A.2d at 628. Justice Cohen's opinion for the Court traced the history of the development of the single publication rule and acknowledged that many jurisdictions had held that the statute of limitations on a defamation claim begins to run on the date of *initial* publication. *Id.,* 439 Pa. at 226, 266 A.2d at 629 (citing *Buckley v. New York Post Corp.,* 373 F.2d 175 (2d Cir.1967); *Zuck v. Interstate Publishing Corp.,* 317 F.2d 727 (2d Cir.1963); *Hartmann v. Time, Inc.,* 166 F.2d 127 (3d Cir.1947), *cert. denied,* 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948); *Kilian v. Stackpole Sons, Inc.,* 98 F.Supp. 500 (M.D.Pa.1951); *Belli v. Roberts Bros. Furs,* 240 Cal.App.2d 284, 49 Cal.Rptr. 625 (1966)). Of the five cases cited for the proposition that the statute of limitations is triggered by the initial publication date, however, only *Belli* involved an interpretation of the Uniform Single Publication Act, while the remainder had interpreted the common law. *Id.* Based on this distinction, the Court held:

> We find that neither the wording of the statute nor the policy behind it requires a holding that the period of limitations begins to run from the time of the first publication. It is clear that the statute was designed to offer protection to the defendant from countless suits, an almost endless tolling of the statute of limitations and diversity in applicable substantive law (although the choice of law problems in this area have scarcely been settled). That purpose can be effectuated by holding that the plaintiff may choose any publication as the single publication which represents his single cause of action.

*Id.,* 439 Pa. at 226–27, 266 A.2d at 629. In adopting this rule, the Court seemed particularly concerned that an "unscrupulous publisher", using the rule that an action accrues on the initial publication as a sword rather than a shield as intended, could publish a few copies of a defamatory article in a distant jurisdiction, then saturate the subject's hometown with a glut of libelous material, without fear of liability. *Id.,* 439 Pa. at 228, 266 A.2d at 629.

Recognizing that its rule could emasculate the statute of limitations, however, the Pennsylvania Supreme Court limited the plaintiff's recovery of damages to publications that occur after the selected publication, and provided an example of what it intended. *Id.,* 439 Pa. at 227, 266 A.2d at 629. A defamatory article is published in New York on January 1, in Pennsylvania on February 1 and in New Jersey on March 1, all in Year 1. All three states have a one-year statute of limitation. Plaintiff brings suit in Pennsylvania on February 15 of Year 2. Under the rule set forth in *Dominiak,* Justice Cohen explained that the plaintiff could not recover damages for publications in New York before February 15 of Year 1; could recover for all damages suffered in New Jersey because the statute of limitations has yet not expired there; and could recover in Pennsylvania for damages suffered as a result of publications after February 15 of Year 1, but not before that time. *Id.* Although this solution seems to create a problem of its own (namely, the task of ascertaining damages caused by publications after a certain date while excluding damages caused before that date), the Court suggested that the damage inflicted by a defamatory daily newspaper would be greatest the day or two following publication when most readers would be likely to see it, while the damages caused by a libelous book might be more constant over time or even increase as sales escalate. *Id.,* 439 Pa. at 227–28, 266 A.2d at 629.

In separate opinions, Justices Roberts, Pomeroy and Jones concurred in the result in *Dominiak.* *Id.,* 439 Pa. at 229–30, 266 A.2d at 630. Justice Roberts would have held that "the statute begins to run, at the earliest, from the time a publication first reaches the allegedly defamed individual's community." *Id.,* 439 Pa. at 230, 266 A.2d at

630. In a footnote, Justice Roberts suggested that "[i]n a dated publication the date assigned by the publisher might well control the running of the statute, especially where that date might have misled the plaintiff into believing that the statutory period had not yet run." *Id.*, 439 Pa. at 230 n. *, 266 A.2d at 630, n. *. Justice Pomeroy, joined by Justice Jones, would have held that "the first publication of the alleged defamation in the state in which suit is brought should be taken as the single publication and so mark the date from which the statute runs." *Id.*, 439 Pa. at 231, 266 A.2d at 631.

Only two reported Pennsylvania cases have cited *Dominiak* since it was decided. The first, a 1983 Pennsylvania Supreme Court opinion, addressed the issue of what constitutes a "single publication" for the purposes of the Single Publication Act. *Graham v. Today's Spirit,* 503 Pa. 52, 468 A.2d 454 (1983). Two newspapers, *Today's Post* and *Today's Spirit,* published on the same day nearly identical articles, written by the same author, about the plaintiffs. *Id.*, 503 Pa. at 55, 468 A.2d at 456. Although the newspapers were published by the same company at the same location, they had separate mastheads, circulation staffs, business addresses, bank accounts and areas of circulation. *Id.* After plaintiffs filed suit first in Montgomery County and then in Bucks County, the Court of Common Pleas dismissed the second suit on the basis of the Uniform Single Publication Act. *Id.*, 503 Pa. at 56, 468 A.2d at 456. The Supreme Court reversed, holding that each article constituted a separate publication which could independently support a cause of action. *Id.*, 503 Pa. at 59, 468 A.2d at 458.

*Graham* cited *Dominiak* once for a broad proposition concerning the Uniform Single Publication Act:

> This legislation [*i.e.*, the Uniform Single Publication Act] was adopted to "eliminate such successive, oppressive harassment", *Gaetano, supra,* 426 Pa. at 184, 231 A.2d at 756 (1967), *accord, Dominiak v. National Enquirer,* 439 Pa. 222, 266 A.2d 626 (1970), by protecting publishers from a multitude of lawsuits based on one tortious act. If this protection was not afforded publishers, then at a minimum the statute of limitations would be meaningless in that an action could be filed any time a defamatory article was read, no matter the time lag between the actual printing of the article and the reading of the article by a third party.

*Graham,* 503 Pa. at 57, 468 A.2d at 457. The Court went on to cite the *Restatement (Second) of Torts* generally for a further explanation of the Uniform Act, and concluded its discussion with the statement that "it is the original printing of the defamatory material and not the circulation of it which results in a cause of action." *Id.*, 503 Pa. at 58, 468 A.2d at 457.

The second reported Pennsylvania case was *Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 311, 483 A.2d 456, 464 (1984). *Agriss* made only one reference to *Dominiak,* but its relevance to the present controversy will be immediately apparent: "*Compare Dominiak v. National Enquirer,* 439 Pa. 222, 266 A.2d 626 (1970); Annot., 42 A.L.R.3d 807, §§ 5–6 (1972) (where defamatory material is contained in mass media, 'publication' occurs when media released or distributed for mass sale to public)."

Two federal courts within this circuit, applying Pennsylvania law, have addressed the rule announced in *Dominiak.* In *Andrews v. Time, Inc.,* 690 F.Supp. 362 (E.D.Pa.1988), Judge Bechtle entered summary judgment for the publisher of *People* magazine against a libel plaintiff on the grounds that her suit was barred by the one-year statute of limitations. Judge Bechtle began his discussion with the Uniform Single Publication Act and then described the result in *Dominiak* before concluding that "*Dominiak* stands for the proposition that the date of first *statewide* publication, rather than of first nationwide publication, should trigger the statute of limitations." *Andrews,* 690 F.Supp. at 366 (emphasis in original) (citing *Sheeran v. Brill,* No. 80–4574, slip. op. at 3 (E.D.Pa. filed April 28, 1981) (unpublished opinion), *aff'd,* 673 F.2d 1302 (3d Cir. December 4, 1981) (unpublished opinion)).

Turning to the more recent decision in *Graham v. Today's Spirit,* Judge Bechtle in *Andrews* held that "it is the original printing

of the defamatory material and not the circulation of it which results in a cause of action." *Andrews,* 690 F.Supp. at 366. Judge Bechtle concluded that since *Graham* freely interchanged "original printing" and "original publication" throughout, he held that the "crucial task is to determine when the original publication of the allegedly defamatory article occurred." *Id.* In harmonizing the two decisions of the Pennsylvania Supreme Court, Judge Bechtle wrote:

> Although dicta in *Dominiak, supra,* 266 A.2d at 269, seemed to imply that a plaintiff may choose any publication as the single publication which represents her single cause of action, the more recent Supreme Court holding in *Graham, supra,* 468 A.2d at 457, makes it clear that a plaintiff may not just choose any publication of the allegedly defamatory material to start the running of the statute of limitations.

*Andrews,* 690 F.Supp. at 366. The plaintiff did not appeal this decision.

The second federal case in this Circuit to mention the result in *Dominiak* was *Bailey v. Dell Publishing Co., Inc.,* 790 F.Supp. 101 (W.D.Pa.), *aff'd,* 983 F.2d 1049 (3d Cir.1992) (table). In *Bailey,* a Congressman brought a defamation and invasion of privacy action against the authors and publisher of a book that he alleged portrayed him as engaging in criminal conduct. After the defendants moved for summary judgment on statute of limitations grounds, then-District Judge Lewis addressed the plaintiff's "argu[ment] that under *Dominiak,* . . . he can choose any single act of publication—no matter how remote in time or place from the first publication—as the date from which the statute is to run. Thus, plaintiff's action would not be time barred. This court declines to venture into this uncharted area of the law because plaintiff's second and third arguments are persuasive." *Bailey,* 790 F.Supp. at 104.[14]

Recognizing that, as one treatise describes this topic, "[a]bout the only safe generalizations that can be made are that the problem is difficult, no one solution appears appropriate for all cases, and the law is not settled",

Harper, James & Gray, *The Law of Torts* § 5.16 (2d ed. 1986) (footnote omitted), we nonetheless must predict how the Pennsylvania Supreme Court would today decide this issue. As has been noted before, the difficulty in determining a legal issue in a diversity case arises from the perils of forecasting the position the supreme court of a state will take on an earlier, or an as-yet undecided or a subsequently-questioned issue, as we are required to do. *See,* Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction through the Lens of Federalism,* 78 Va. L.Rev. 1671, 1675–81 (1992) ("[T]he state courts have found fault with a not insignificant number of past '*Erie* guesses' made by the Third Circuit and our district courts.").

Interpreting *Dominiak* in the light of *Graham,* assisted with the Superior Court's gloss on "publication" in *Agriss,* we hold that the Bradfords may select any time within which the *Star* became available in Pennsylvania on which to base their defamation and invasion of privacy actions. The undisputed record shows that the latest such availability was September 1, 1993, when the last retail outlets received the September 7 number, more than a year before the Bradfords commenced this action.

The fact that some copies remained at newsstands until the day after Labor Day is of no more moment than a stack of stale issues being left on a park bench. The very purpose of the Uniform Single Publication Act was to avoid the "endless tolling of the statute of limitations" to which *Dominiak* set its face. Accrual of a cause of action must therefore rest on the readily-ascertainable delivery dates, not on the conjectures and fortuity of later "circulation" which would make the statute of limitations "meaningless", *Graham,* 503 Pa. at 57–58, 468 A.2d at 457.

### C. *Discovery Rule Applied to Defamation Cases*

■ The Bradfords alternatively argue that the statute of limitations should be tolled

---

**14.** As American Media Operations notes in its reply brief at 6, *Bailey* did not refer to the *An-* *drews* decision, decided four years earlier.

on their defamation and invasion of privacy claims by virtue of a "discovery rule". According to Black's, such a rule is typically applied to limitations statutes in "malpractice cases ... *i.e.*, the cause of action does not accrue, until the date of discovery of the malpractice, or the date when, by the exercise of reasonable care and diligence, the patient should have discovered the wrongful act." *Black's Law Dictionary* 466 (6th ed. 1990). The Bradfords ask us to apply a discovery rule to their defamation action and thus hold that the claim accrued for statute of limitations purposes on September 8, 1993, the date that Mrs. Bradford says she first learned of the *Star* article. Affidavit of Rosalie Bradford, appended to Response, ¶ 6.

The Bradfords cite two cases for support of their contention that Pennsylvania law applies the discovery rule to defamation actions. The first, a 1992 decision by the Pennsylvania Superior Court, involved an allegedly defamatory publication of information from an employer to the Federal Bureau of Investigation ("FBI"). *Gallucci v. Phillips & Jacobs, Inc.*, 418 Pa.Super. 306, 310, 614 A.2d 284, 286 (1992). The employer, believing that Gallucci had committed industrial espionage, provided the FBI with information about Gallucci, including records of phone calls between Gallucci and the employer's chief competitor, as well as computer records that showed Gallucci's access to files of prospective customers. *Id.*, 418 Pa.Super. at 310, 614 A.2d at 286–87.

Gallucci filed suit against his employer for defamation and malicious prosecution on April 17, 1985, more than one year after the employer's communications to the FBI. *Id.*, 418 Pa.Super. at 311, 614 A.2d at 287. Gallucci argued that he did not have access to the FBI's files and thus could not prepare a complaint. *Id.*, 418 Pa.Super. at 314 & n. 1, 614 A.2d at 288 & n. 1. The Court of Common Pleas applied the discovery rule, holding that it was an issue for the jury to determine whether Gallucci knew or should have known that his employer had provided information to the FBI before April 17, 1984, one year prior to the filing of suit, even if he did not know the exact nature of those communications. *Id.*, 418 Pa.Super. at 315, 614 A.2d at

289. The jury found that Gallucci indeed did know of the employer's communications before April 17, 1984 and thus reached a verdict for the defendant. *Id.*

On appeal, the Superior Court affirmed the Common Pleas Court's use of the discovery rule and the submission of the issue to the jury. *Id.* Quoting from *Sadtler v. Jackson Cross Co.*, 402 Pa.Super. 492, 501, 587 A.2d 727, 732 (1991), the court held that "[t]he point of time at which the injured party should *reasonably be aware* that he or she has suffered an injury is generally an issue of fact to be determined by the jury." *Id.* (emphasis added).

The other case to refer to the discovery rule in a defamation claim in Pennsylvania was *Bailey v. Dell Publishing Co., Inc.*, 790 F.Supp. 101 (W.D.Pa. April 20, 1992), *aff'd*, 983 F.2d 1049 (3d Cir.1992) (table), discussed *supra*. Then–District Judge Lewis observed that while "the discovery rule is most frequently applied in personal injury cases, it has also surfaced in a defamation action." *Bailey*, 790 F.Supp. at 105. The case to which Judge Lewis was referring was the Common Pleas Court's opinion in *Gallucci*. *Bailey*, 790 F.Supp. at 105 (citing *Gallucci v. Phillips & Jacobs*, 23 Phila. 219, 1991 WL 487494; 1991 Phila.Cty.Rptr. LEXIS 95, p. 4 (November 4, 1991)).

Because Judge Lewis filed his opinion in *Bailey* on April 20, 1992, and the Superior Court affirmed the Common Pleas Court in *Gallucci* three weeks later (on May 13, 1992), he did not have the benefit of the Superior Court's opinion when he decided *Bailey*. Accordingly, any reliance on *Bailey* for the proposition that Pennsylvania applies the discovery rule to defamation actions is, at best, dubious. In any event, Judge Lewis's reference to the discovery rule was unnecessary to the determination of the case, and thus was *dictum*, since he also relied on another of plaintiff's arguments, finding that there was a genuine issue of material fact as to "exactly when [the book] was placed on sale in any particular Pennsylvania bookstore." *Id.* at 104.

The Bradfords' argument for a "discovery rule" in this libel action seems to us at variance with the policy that animated *Do-*

*miniak* and *Graham.* As the Superior Court held in *Agriss, supra,* "publication" occurs "when media [is] released or distributed for mass sale to [the] public." Such "publication" is the objective triggering event for the statute of limitations in libel cases, and thus the happenstance of when one particular plaintiff happens to see the offending publication can be of no legal moment.

Additionally, application of the discovery rule in libel cases does violence to both the plain and legal meanings of *publication.* One leading dictionary defines *publication* as "[t]he action of making publicly known; public notification or announcement; promulgation." XII *The Oxford English Dictionary* 782 (2d ed. 1989). Webster's specifies that *publication* is "communication (as of news or information) to the public: public announcement". *Webster's Third New International Dictionary* 1836 (unabridged) (1986). Black's describes *publication* as "[t]he act of making the defamatory matter known publicly, of disseminating it, or communicating it to one or more persons (*i.e.,* to third person or persons). The reduction of libelous matter to writing and its delivery to any one other than the person injuriously affected thereby." *Black's Law Dictionary* 1228 (6th ed. 1990). If the *Star* was "publicly known" throughout Pennsylvania by September 1, 1993 at the latest, there was, by both the ordinary and legal meanings of *publication,* nothing to "discover" thereafter. This is particularly so for a publication as widely distributed as the *Star.* *See* December 31, 1993 Audit Bureau of Circulations Statement, appended to Motion, Exhibit B (3,003,235 total circulation for the September 7, 1993 edition).[15]

This textual reading conforms with Pennsylvania's well-established strictness in applying discovery rules. For example, a plaintiff's insanity, even a mental disability that forecloses "discovery" of any outer reality apprehensible to unimpaired people, does not in Pennsylvania toll the statute. 42 Pa.Cons. Stat.Ann. § 5533(a). *See, e.g., Bowser v.*

*Guttendorf,* 373 Pa.Super. 402, 406, 541 A.2d 377, 379–80 (1988).

In any event, since Pennsylvania law has always premised discovery on the actions of a reasonable person, *see e.g., Bradley v. Ragheb,* 429 Pa.Super. 616, 620–22, 633 A.2d 192, 194–95 (1993), it would seem to us that no such person could be deemed unaware of a publication so widely distributed in Pennsylvania no later than September 1, 1993. This conclusion is fortified by the Pennsylvania Supreme Court's consistent stress on the importance of statutes of limitations:

> The defense of the statute of limitations is not a technical defense but substantial and meritorious.... Such statutes are not only statutes of repose, but they supply the place of evidence lost or impaired by lapse of time, by raising a presumption, which renders proof unnecessary.... Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation....

*Schmucker v. Naugle,* 426 Pa. 203, 205–206, 231 A.2d 121, 123 (1967) (quoting *United States v. Oregon Lumber Co.,* 260 U.S. 290, 299–300, 43 S.Ct. 100, 102, 67 L.Ed. 261 (1922) (quotation marks omitted)).

We do not believe the Pennsylvania Supreme Court would give Mrs. Bradford the grace of discovery for this, the third most widely circulated weekly publication in America.

### D. *Estoppel Due to the "Cover Date"*

■ Finally, *Dominiak* forecloses the Bradfords' argument that American Media Operations should be estopped from asserting any publication date other than the cover date of the issue in question. Since that contention was explicitly addressed in Justice Roberts's concurring opinion, 439 Pa. at 230 n. *, 266 A.2d at 630, n. *, that rule could

---

**15.** Admittedly, exclusive reliance on the textual meaning of *publication* may be unwarranted. For example, a plaintiff who is not a member of a specialized audience of, say, a scholarly journal might stake a stronger claim for a discovery rule.

When a publication of general and, as here, very wide circulation is involved, however, we believe the Pennsylvania Supreme Court would follow the traditional strictness of Pennsylvania law, noted in the text, on discovery.

hardly be law of Pennsylvania, since it found no part in Justice Cohen's opinion for the *Dominiak* majority.

III. *Conclusion*

Under our interpretation of *Dominiak*, the statute of limitations on plaintiffs' libel and invasion of privacy claims began to run on the last date of publication of the *Star* issue in Pennsylvania, namely, September 1, 1993. The Bradfords did not file suit until September 6, 1994, and thus their causes of action are barred under Pennsylvania's one-year statute of limitations. Furthermore, we predict that the Pennsylvania Supreme Court would not apply a discovery rule to an action premised upon a weekly newspaper with a circulation of over three million. Finally, Pennsylvania law rather clearly attaches no legal significance to a "cover date" that is later than the date the newspaper is actually published.

Accordingly, we shall grant defendants' motion for summary judgment, and an appropriate Order follows.

#### ORDER

AND NOW, this 17th day of April, 1995, upon consideration of defendant's motion to dismiss or, in the alternative, for summary judgment, and the response and reply thereto, and in accordance with the accompanying Memorandum, it is hereby ORDERED that the motion is GRANTED, and JUDGMENT IS ENTERED for defendant American Media Operations, Inc. and against plaintiffs Rosalie and Robert S. Bradford.