Stephen **BARRETT, M.D.,** Plaintiff,

v.

The **CATACOMBS PRESS, James R. Privitera, M.D., Alan Stang, M.A., Darlene Sherrell, and CDS Networks Inc.,** Defendants.

No. Civ. 99–736.

United States District Court, E.D. Pennsylvania.

Sept. 2, 1999.

Steven A. Bergstein, Allentown, PA, for plaintiff.

Malcolm J. Gross, Allentown, PA, for defendants The Catacombs Press, Privitera & Stang.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiff Stephen Barrett filed this action under Pennsylvania's defamation law, against Defendants the Catacombs Press, James R. Privitera, Alan Stang, Darlene Sherrell and CDS Network, Inc. We have jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.

Defendants James R. Privitera, M.D., Alan Stang, M.A. and The Catacombs Press have moved collectively for Summary Judgment pursuant to Fed.R.Civ.P. 56(c) and dismissal of this suit due to the expiration of the statute of limitations on defamation actions. We have reviewed the record and conclude that for the following reasons, Defendants' Motion for Summary Judgment is GRANTED in its entirety.

### II. FACTS

Plaintiff in this case is a resident and psychiatrist in Allentown, Pennsylvania. Barrett Decl. 3/5/99 at ¶¶ 1–2. Since 1969, he has been involved in investigating and dealing with many aspects of quackery, health frauds, misinformation and consumer strategy. *Id.* at ¶ 4. He has also been responsible for writing, co-authoring or editing over 200 publications relating to consumer health. *Id.* Since December 1996, Plaintiff has maintained a computer Web

site called Quackwatch, which provides information about quackery, health frauds and consumer decisions. *Id.* at ¶ 6. Plaintiff's Web site has received international acclaim, with more than fifty awards and/or favorable mentions in newspapers, magazines and journals throughout the world.

Defendant Privitera and defendant Stang co-authored a book, published by defendant Catacombs Press, titled *Silent Clots: Life's Biggest Killer* (*"Silent Clots"* or "the Book"). Within its pages, Barrett alleges, are certain defamatory remarks regarding Mr. Barrett. A detailed chronology of the Book's creation, distribution and sale follows, *infra.*

The two authors, Privitera and Stang, and the publisher, Catacombs Press (a California-registered fictitious business name of Immunoscreen, Inc., a Nevada corporation controlled by Privitera) collaborated on the following schedule: completion of the writing and editing, December 1995; copyright in 1996; printing commenced around February 1, 1997; and printing completed and book ready for distribution and sale on April 24, 1997. Privitera Decl. at ¶¶ 2, 4.

The co-authors appeared on a cable television program on the *Lifetime* network titled "Rise and Shine", which is carried by cable television operators in Pennsylvania, including in the Lehigh Valley area. The program was first broadcast on April 4, 1997 and again on August 28, 1997. *Id.* at ¶ 5. The Book and the co-authors' availability to appear on radio or television talk shows were advertised in the April 20, 1997, May 10, 1997 and June 1, 1997 issues of *Radio–TV Interview Report*, a Pennsylvania publication of Bradley Communications Corp. Of Lansdowne, Pennsylvania. *Id.* at ¶ 6.

The first distribution of the Book occurred on April 25 and 26, 1997, at a national convention of the American College for Advancement in Medicine ("ACAM") held in Tampa, Florida and attended by Pennsylvania alternative healthcare practitioners. *Id.* at ¶ 7. On May 7, 1997, Defendants sold 108 copies of the Book to Paul Cosman, shipping them to Cosman at the Pittsburgh Airport Marriott in Coraopolis, Pennsylvania. *Id.* at ¶ 8. On May 10, 1997, Cosman displayed and sold copies of the Book at a seminar he organized in Coraopolis, whereupon Samuel Yareck of Monongahela, Pennsylvania, purchased 12 copies from Cosman. *Id.;* Yareck Decl. at ¶ 2. Subsequently, between May 1997 and December 1997, Yareck gave away a few copies to acquaintances and displayed the remainder at his store in Charleroi, Pennsylvania, for retail sale, of which he sold six or seven copies during this period. *Id.*

Between May 30, 1997, and June 2, 1997, the co-authors participated in BookExpo America in Chicago, Illinois, an event which is promoted as the "world's greatest book event", the largest author/publisher exhibition in the U.S., attracting more than 1,000 exhibitors, 25,000 publishing industry attendees and about 1,000 media types. Each Defendant attended, manned a booth, greeted visitors and displayed and promoted the Book. Privitera Decl. at ¶ 9.

Since June 11, 1997, the Book has been available for purchase on a website titled <nutriscreen.com> (controlled by Defendants) and since October 22, 1997, it has been available for purchase at <amazon.com> (the world's largest book seller). *Id.* at ¶ 10.

In the December 1997 issue of *Townsend Letter for Doctors and Patients,* mailed to its subscribers, which include 154 Pennsylvanians, on or about November 10, 1997, appeared a review of the Book. This review provided subscribers with information regarding where and how the Book could be purchased. *Id.* at ¶ 12.

In addition to the above activities, Defendants' Memorandum in Support of its Motion for Summary Judgment mentions other sales and promotions of the Book outside of Pennsylvania prior to December 18, 1997, the date one year before Plaintiff's Complaint was filed, which we shall

not be required to review in order to reach our decision.

## III. STANDARD OF REVIEW

Defendants have moved for Summary Judgment to dismiss Plaintiff's Complaint. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (*"Anderson I "*). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party cannot rest on mere denials or allegations, but must respond with facts of record that contradict the facts identified by the movant. *Id.* at 321 n. 3, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also First Nat. Bank of Pennsylvania v. Lincoln Nat. Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson I,* 477 U.S. at 249, 106 S.Ct. 2505.

## IV. DISCUSSION

Defendants James R. Privitera, M.D., Alan Stang, M.A. and the Catacombs Press have moved for Summary Judgment to dismiss Plaintiff's Complaint pursuant to Fed.R.Civ.P. 56(c) by arguing that under Pennsylvania's one year defamation statute of limitations, Barrett's December 18, 1998 Complaint is time-barred.

The relevant facts are not at issue in the instant case; *see* Section II—Facts, *supra.*

**The Pennsylvania Statute of Limitations**

The parties appear to agree that Pennsylvania law governs this diversity action for defamation. *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985) (Pennsylvania law applies to defamation actions in which plaintiffs reside in Pennsylvania and any harm to their reputation that may have occurred as a result of the challenged publication is largely centered in Pennsylvania). As neither party has raised an objection, we shall assume that Pennsylvania law controls in this action.

█ Pennsylvania law provides for a one-year statute of limitations for defamation. 42 Pa.Cons.Stat. § 5523(1). Under Pennsylvania law, a statute of limitations begins to run at the time the plaintiff's cause of action accrues. 42 Pa.Cons.Stat. § 5502(a). Plaintiff Barrett commenced his state court action on December 18, 1998. That action was subsequently removed to the District Court. The initial question for this court is whether Plaintiff's cause of action accrued prior to December 18, 1997.

In *Bradford v. American Media Operations, Inc.,* 882 F.Supp. 1508 (E.D.Pa. 1995), a case in which a Pennsylvania resident sued the publisher of a national newspaper for defamation and invasion of privacy, it was held that the plaintiffs could select "any time within which the [allegedly defamatory publication] became available in Pennsylvania on which to base their defamation and invasion of privacy actions." *Bradford,* 882 F.Supp. at 1517.

█ At the *latest,* the Book in the case at bar became available in Pennsylvania

within days after November 15, 1997, the date the December 1997 issue of the *Townsend Letter for Doctors and Patients* was mailed to, among others, 154 Pennsylvanians, where a review of the Book provided subscribers with purchase information. Therefore, in the absence of a tolling of the one-year statute of limitations, the Plaintiff's cause of action has become stale.

### Effect of the Discovery Rule in Defamation Actions

In order for the Plaintiff to prevail on this Motion, the applicable statute of limitations must have tolled on Plaintiff's defamation claim until the time Mr. Barrett became aware of the defamatory remarks contained in the Book. Such a tolling rule is commonly referred to as a "discovery rule." *See, e.g., Bradford,* 882 F.Supp. at 1517–18. The next question, then, is whether the discovery rule may be applied here. For the reasons that follow, we believe that the discovery rule may not be applied.

Such a discovery rule, according to *Black's Law Dictionary,* is generally applied in malpractice suits, where the statute "does not start to run, *i.e.,* the cause of action does not accrue, until the date of discovery of the malpractice, or the date when, by the exercise of reasonable care and diligence, the patient should have discovered the wrongful act." *Black's Law Dictionary* 466 (6th ed.1991).

▮ Plaintiff Barrett has cited several cases to support his contention that the discovery rule applies to defamation actions under Pennsylvania law. None of the cases cited, however, is directly on point.

In the first case cited by Barrett, *Gallucci v. Phillips & Jacobs, Inc.,* 418 Pa.Super. 306, 614 A.2d 284 (1992) *app. denied,* 533 Pa. 660, 625 A.2d 1193 (1993), the plaintiff filed suit against his employer for, *inter alia,* defamation, due to the allegedly defamatory content of the employer's clandestine communications with the FBI regarding that plaintiff. In *Gallucci,* unlike in the present controversy, the allegedly defamatory writings were private communications between plaintiff's employer and the FBI. No third party—including the plaintiff—could have even been aware of the existence of such communications, as it is in the nature of secure message dissemination that no third party be made aware of the existence of such communications. This was the intent of the defendant in *Gallucci,* whereas in the case at bar, no such secretive tactics were employed. Thus, the rationale in *Gallucci* for allowing the jury to decide whether a tolling of the statute occurred, rather than being a matter of law to be decided by the court, is wholly absent here. The *Bradford* court specifically refused to find *Gallucci* an appropriate yardstick in a case such as the one at bar where a "publication" has occurred. *See Bradford,* 882 F.Supp. at 1518–19.

Similarly, in *Giusto v. Ashland Chemical Co.,* 994 F.Supp. 587 (E.D.Pa.1998), the court's recitation of the discovery rule being applicable in the defamation context is merely dicta, as the court did not rely on the discovery rule in its decision. In fact, the court did not even have the opportunity to apply the discovery rule in that case due to an infirmity of the complaint. The *Giusto* court indicated that, "[i]n ruling on a motion to dismiss on statute of limitations grounds, the Court may not look beyond the face of the complaint. Thus, 'a 12(b)(6) motion should not be granted on limitations grounds unless the complaint facially shows noncompliance with the limitations period.'". *Id.* at 594 (*quoting Clark v. Sears Roebuck & Co.,* 816 F.Supp. 1064, 1067 (E.D.Pa.1993) (citation omitted)). Unfortunately for that plaintiff, his complaint did not on its face make clear "when plaintiff became aware, or should have become aware, of the statements at issue." For that reason alone, the court never addressed the larger issue of whether to apply the discovery rule. *Giusto* at 594.

Similarly, in another case cited by the Plaintiff, *DiNicola v. DiPaolo,* 945 F.Supp.

848 (W.D.Pa.1996) (which is the only case cited by *Giusto* for invoking the discovery rule), the discovery rule's recitation is not a factor in the decision. There, "the alleged unlawful acts giving rise to all of the foregoing causes of action were known to [p]laintiff at least by 1984," well over a year before the defamation action was first brought by that plaintiff. *DiNicola,* 945 F.Supp. at 861. Thus, the discovery rule was moot under those circumstances.

Additionally, in *DiNicola,* the recitation of the rule was in the context of a case involving a myriad of state law claims. *See id.* It is doubtful that the court would have performed the same analysis regarding the applicability of the discovery rule to a defamation claim, had these additional state law claims not been present.

Lending support to this possibility is another case cited by Mr. Barrett, *Doe v. Kohn Nast & Graf, P.C.,* 866 F.Supp. 190 (E.D.Pa.1994). Although the Plaintiff has referred us to *Doe* in order to support the proposition that the discovery rule should control in a defamation action, the case falls far short of such a holding. The *Doe* plaintiff brought suit against his former employer alleging several different varieties of malfeasance, including, *inter alia,* defamation and invasion of privacy. The defamation claim was dismissed on grounds wholly unrelated to the application of the discovery rule, which is not even discussed in the context of the defamation claim. Rather, the court in *Doe* only addressed the discovery rule on the plaintiff's invasion of privacy claim. In that regard, plaintiff alleged that his former employer was, while plaintiff was an employee, secretly opening and reading his personal mail, without notifying him.

In the case at bar, on the other hand, we are being asked to apply the discovery rule in a defamation suit, *not* an invasion of privacy suit. Further, unlike the *Doe* plaintiff, our Plaintiff was not deprived of an opportunity to learn of the alleged injury being perpetrated against him. Rather, Mr. Barrett could have discovered the publication. Interestingly, *DiNicola* cited *Doe,* notwithstanding its limited holding, while *Giusto* cited *DiNicola,* although its holding does not turn on the discovery rule. We cannot be expected to follow a rule that has not actually been applied previously in the defamation context, absent clear statutory authority. As the parties are well aware, no such clear authority exists. Indeed, as we have indicated, *supra,* certain policy arguments lead us to the opposite conclusion—that we should *not* apply such a rule of discovery in the defamation context.

These policy arguments inform the reasoning in another case cited by both sides: *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164 (1997). As the Plaintiff is quick to point out, this is not a defamation action, but rather, a suppressed-memory case. However, its relevance is not diminished here, as Mr. Barrett contends. In Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Mr. Barrett focuses on the distinction between the subjective test and objective test delineated by the court in *Dalrymple.* Plaintiff's focus misses the mark, as the true relevance of *Dalrymple* to the case at bar is its identification of the limited uses for which the discovery rule may be applied.

The court stated, "[t]he very essence of the discovery rule in Pennsylvania is that it applies only to those situations where the nature of the injury itself is such that *no amount of vigilance* will enable the plaintiff to detect an injury." (*citing Pocono Int'l Raceway v. Pocono Produce,* 503 Pa. 80, 468 A.2d 468 (1983)) (emphasis supplied). *Dalrymple,* 549 Pa. at 228–229, 701 A.2d 164.

■ The courts have not developed the equitable concept of the discovery rule in order to aid a plaintiff in a defamation action where the allegedly defamatory material was published, advertised and distributed freely to any willing purchaser. Under such circumstances, we conclude, the question of the applicability of Pennsylvania's objective, reasonable person, standard, is inapposite.

It cannot be stressed enough that at the heart of Pennsylvania's statutes of limitations lies an important public policy, foundational in the purposes for which such statutes have been adopted:

The defense of the statute of limitations is not a technical defense but substantial and meritorious.... Such statutes are not only statutes of repose, but they supply the place of evidence lost or impaired by lapse of time, by raising a presumption, which renders proof unnecessary.... Statutes of limitation are vital to the welfare of society and are favored in the law.... They promote repose by giving security and stability to human affairs.

*Bradford,* 882 F.Supp. at 1519 (*quoting Schmucker v. Naugle,* 426 Pa. 203, 205–206, 231 A.2d 121 (1967) (*quoting U.S. v. Oregon Lumber Co.,* 260 U.S. 290, 299–300, 43 S.Ct. 100, 67 L.Ed. 261 (1922))). We believe that we must exercise caution where a party has urged us to apply an exception to avoid the effect of such a statute, lest we do away with the statute's salutary purpose in the process.

### The Discovery Rule in Media–Public Defamation Claims

■ Implicit in the above analysis is that we are not dealing with clandestine operations on Defendants' part, as we have distinguished the case at bar from certain other cases that involved secret communications where the plaintiffs could not have been expected to discover the defamatory writings. In short, we have already concluded that the discovery rule should not be applied where, as here, a defendant's alleged defamation was not done in a manner meant to conceal the subject matter of the defamation.

To clarify our holding, we would like to emphasize that in the case of a media-public defamation action, where the defamatory writing has actually been published, there is an even stronger rationale for eschewing the discovery rule.

"Publication" occurs "when media [is] released or distributed for mass sale to [the] public." *Bradford,* 882 F.Supp. at 1519 (*quoting Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 483 A.2d 456 (1984)). The court in *Bradford* continued:

Such "publication" is the objective triggering event for the statute of limitations in libel cases, and thus the happenstance of when one particular plaintiff happens to see the offending publication can be of no legal moment.

*Bradford,* 882 F.Supp. at 1519. The question is whether we can find that a publication occurred that would fortify our rationale in finding that the statute of limitations has run. We believe this question can be answered in the affirmative.

■ As the term "publication" was defined in *Agriss,* quoted approvingly in *Bradford,* a "publication" really is based upon the intent of the party that wishes to publish, so long as there occurs a "release[ ] or distribut[ion]" of media. *Id.* That is because such a release or distribution, to be a "publication," must be "for mass sale to [the] public." *Id.* This language can most sensibly be interpreted, we believe, to mean that the publisher of the media intended to make publicly known the media being released or distributed and took steps reasonably calculated to achieve this end. Thus, for there to be a publication, two tests are employed: 1) there must be an actual release or distribution of media and 2) the party authorizing the release or distribution must intend to bring about a mass sale to the public reasonably calculated to achieve such a mass sale.

■ In the case before us, both prongs of this test are satisfied. Actual distributions of the Book occurred on April 25 and 26, 1997, at the national convention of the ACAM in Tampa, Florida. Privitera Decl. at ¶ 7. Further, a distribution of 108 copies of the Book took place on May 7, 1997, to Paul Cosman, who later resold some of the copies he had purchased from the Defendant, including 12 copies sold by Cosman to Samuel Yareck on May 10, 1997. Privitera Decl. at ¶ 8; Yareck Decl. at ¶ 2.

Yareck later sold and gave away several copies of the Book at his retail store in Charleroi, Pennsylvania, during the remainder of 1997. Yareck Decl. at ¶ 2.

None of these acts of release and distribution is refuted by Barrett. Further, Defendants satisfy the second prong of the test: they could only have intended to bring about a mass sale to the public, in selling the copies of the Book as described above, which was performed in a manner reasonably calculated to achieve such a mass sale. If any doubt had remained as to Defendants' intentions, such doubt would be evaporated by the knowledge that Privitera and Stang, the co-authors, had participated in the BookExpo America in Chicago, an event attended by "more than 1,000 exhibitors, more than 25,000 publishing industry attendees, and about 1,000 members of the media." Privitera Decl. at ¶ 9. Further, Defendants utilized two separate websites to promote their Book. The totality of activities undertaken by Defendants brings us to conclude that, as a matter of law, a publication had occurred prior to December 18, 1997, as Plaintiff has not introduced facts to put into dispute Defendants' version of events.

■ Again, it does not matter whether Barrett became aware of the defamatory writings, so long as a publication has occurred. The court in *Bradford* cites several lexicographic authorities approvingly to buttress its holding. For example, *Black's* describes "publication" as "[t]he reduction of libelous matter to writing and its delivery to any one other than the person injuriously affected thereby." *Black's Law Dictionary* 1228 (6th ed.1990). The discovery rule, under such circumstances, is simply unavailable. *See Bradford,* 882 F.Supp. at 1519.

Plaintiff Barrett would have us distinguish the case at bar from the holding in *Bradford,* because in that case the allegedly defamatory material was published in the *Star,* a publication particularly widely distributed. However, there is nothing to suggest that the court would have come to a different conclusion had the allegedly

defamatory matter been published in a less-widely circulated medium. That court's remark that the inapposite nature of the discovery rule was "particularly so for a publication as widely published as the *Star*", *id.* at 1519, does not even rise to the level of dicta, as it was not merely unnecessary to the court's holding, but was inserted to complete a grand-slam where the game was already over. The court in *Bradford* had already made clear its intent to "follow the traditional strictness of Pennsylvania law ... on discovery." *Id.*

## V. CONCLUSION

For all of the above reasons, the Motion for Summary Judgment of Defendants the Catacombs Press, James R. Privitera, M.D. and Alan Stang, M.A., is GRANTED in its entirety. We note that we have already dismissed the action against two original defendants, (i) Darlene Sherrell, by Order granting her Motion to Dismiss for lack of jurisdiction over her person and (ii) CDS Networks, Inc., by agreement of the Plaintiff. An appropriate order follows.

## ORDER

AND NOW, this 2nd day of September, 1999, upon consideration of Defendants' Motion for Summary Judgment and Exhibits thereto; and Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and Exhibit thereto; it is hereby ORDERED that:

(1) Defendants' Motion for Summary Judgment is GRANTED in its entirety.

(2) Judgment shall be entered in favor of all Defendants and against the Plaintiff Stephen Barrett, M.D.

(3) This case is closed.