**C. Lamont SMITH, Plaintiff,**

v.

**IMG WORLDWIDE, INC. and Thomas J. Condon, Defendants.**

**Civil Action No. 03–4887.**

United States District Court, E.D. Pennsylvania.

June 7, 2006.

See, also, 360 F.Supp.2d 681.

George W. Croner, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Plaintiff.

Samuel J. Pace, Dugan, Brinkmann, Maginnis and Pace, Philadelphia, PA, for Defendants.

*MEMORANDUM*

DuBOIS, District Judge.

## I. BACKGROUND

On June 24, 2003, plaintiff, C. Lamont Smith, filed this action against Thomas J. Condon ("Condon") and Condon's employer, IMG Worldwide, Inc. ("IMG") in the Court of Common Pleas of Philadelphia. Defendants removed the case to this Court on August 26, 2003 based on diversity of citizenship jurisdiction under 28 U.S.C. § 1332. Plaintiff asserts claims of defamation and interference with prospective contractual relations that allegedly arose out of competition between plaintiff and Condon to represent highly-touted college football players prior to their entry into the National Football League ("NFL") draft.

Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## II. FACTS

The facts of this case are set forth in a previous opinion, *Smith v. IMG Worldwide, Inc.*, 360 F.Supp.2d 681 (E.D.Pa. 2005). Therefore, only the facts necessary to the summary judgment decision are included in this memorandum.

Plaintiff and Condon are professional sports agents. Plaintiff, who is African–American, founded All Pro Sports and Entertainment, Inc. ("All Pro") in 1987. Smith Dep. at 11–12, Pl.Ex. 1. Since starting his own business, plaintiff has represented top-flight football players such as Eddie George, Jerome Bettis, and Barry Sanders. Presentation to Kenyatta Walker (hereinafter "Walker Presentation") at 5–10, Pl.Ex. 2. Between 1991 and 2000, plaintiff represented eleven (11) players selected in the first round of the NFL draft. Expert Report of Timothy K. Bradley, CPA (hereinafter "Bradley Report") at 3, Pl.Ex. 14. Between 2001 and 2004, plaintiff represented only one first-round draft pick. *Id.* Plaintiff alleges that this sharp decline in his representation of high-end players is directly attributable to Condon's repeated defamations to prospective professional players that plaintiff uses the "race card" in contract negotiations with NFL clubs. Compl. ¶¶ 13, 16, 19. Plaintiff specifically points to the recruitment of three players—Kenyatta Walker, Antonio Bryant, and Larry Johnson, Jr.—during which Condon allegedly made his "race card" remarks. *Id.*

Condon, who is white, is the President of IMG Football, which is a division of IMG. Condon Biography, Pl.Ex. 15. Under Condon, IMG Football has represented such football stars as Peyton Manning, Eli Manning, LaDainian Tomlinson, and Marvin Harrison in signing some of the most lucrative contracts in the NFL. *Id.* The *Sporting News* has named Condon the "most powerful agent in any sport." *Id.* Between 1997 and 2004, Condon negotiated contracts for twenty-nine (29) first-round draft picks. *Id.* Condon has denied having any conversations with prospective professional football players about plaintiff or plaintiff's relationships with NFL general managers. Condon Dep. at 72–73, Pl.Ex. 7.

### A. *Recruiting Kenyatta Walker*

In November and December 2000, plaintiff and Condon were competing for a contract to represent Kenyatta Walker ("Walker"), an offensive lineman at the University of Florida and prospective professional football player. Anderson Dep. at 21–22, Pl.Ex. 5; Walker Dep. at 32–33, Def. Ex. 4. Plaintiff alleges that, in the course of the competition to sign Walker, Condon told Walker that plaintiff alienated general managers of NFL clubs because

he "plays the race card in negotiating contracts." Compl. ¶ 13.

Plaintiff testified that the alleged defamation involving Walker was communicated to him in a telephone conversation with Walker one day after Condon spoke with Walker. Smith Dep. at 25–26. According to plaintiff, Walker said that:

he had been advised that general managers did not like dealing with me because I played the race card in negotiations. . . . [Walker said] that Tom Condon had advised him . . . that [he] better be careful with dealing with me because I play the race card.

Id. at 26:2–4, 8–10. Plaintiff could not recall the exact date of this telephone conversation. Id. at 25. One of plaintiff's associates, Kent Anderson, testified that the telephone conversation occurred before the Southeastern Conference championship game in 2000.[1] Anderson Dep. at 25:9–10.

Plaintiff testified that, prior to the alleged defamation, the recruitment of Walker was going "extremely well." Smith Dep. at 26:1–2. On the day after the alleged defamation, Walker uncharacteristically failed to return calls from Anderson. Anderson Dep. at 25. When Walker was finally reached later that day, Anderson testified that Walker "just sounded different." Id. at 25:25. Anderson asked Walker what had happened, and Walker responded that "he had met with IMG the night before." Id. at 26:5–6. Shortly thereafter, according to both Anderson and plaintiff, Anderson connected his call with Walker to the All Pro office in Denver and plaintiff joined the telephone conversation. It was in that telephone conversation that plaintiff said Walker told him about Condon's alleged defamatory re-

mark. Smith Dep. at 25; Anderson Dep. at 28.

Walker has denied that the events took place in the manner described by plaintiff. Walker Dep. at 33, 41. Walker has no memory of anyone at IMG, including Condon, making anything more than general comments about plaintiff. Id. at 32–33. Condon generally denies all of plaintiff's allegations. Condon Dep. at 45.

Walker signed with IMG after participating in the Sugar Bowl on January 2, 2001. Walker Dep. at 45. Walker testified that he chose IMG over plaintiff "strictly on who I was comfortable with." Id. at 46:24. When asked about plaintiff's supposed use of the "race card," Walker replied: "No. It was no race card on the decision with IMG or Lamont. If it was black or white or purple, [race] had nothing to do with it. It was what I felt was better for me." Id. at 49: 6–9. Walker was selected in the first round of the 2001 NFL draft by the Tampa Bay Buccaneers. Bradley Report at 7.

### B. Recruiting Antonio Bryant

In January 2002, plaintiff and Condon were competing for a contract to represent Antonio Bryant ("Bryant"), a highly-skilled wide receiver from the University of Pittsburgh and prospective professional football player. Smith Dep. at 37; Sanders Dep. at 47, Def. Ex. 5. Plaintiff alleges that, during a meeting with Bryant and Charles Sanders ("Sanders") in January 2002, Condon said that "Bryant needed to be careful about retaining [plaintiff] as his agent because plaintiff . . . 'plays the race card' in his negotiations with NFL clubs." Compl. ¶ 16.

---

1. The Court takes judicial notice of the fact that, on December 2, 2000, the University of Florida football team played in the SEC Championship game. Available at, http://sportsillustrated.cnn.com/football/college/schedules/ 2000/team/ffa/ (last visited May 31, 2006).

While recruiting Bryant, Condon visited Sanders's home in Pittsburgh in January 2002. Sanders Dep. at 35–36; Singletary Dep. at 27, Pl.Ex. 11. Sanders, who advised Bryant in choosing an agent, testified that Condon commented on plaintiff's use of race in contract negotiations during that meeting. Sanders Dep. at 45. According to Sanders, Condon said:

'Hey, you know something else you got to be careful of with Lamont is he plays the race card and a lot of the general manager[s] are getting tired of that. I know the [general manager] at Tennessee is tired of it, and, you know, that's not a good thing.'

*Id.* at 45: 11–16. Although plaintiff alleges that the comments were made to Bryant and Sanders, Sanders testified that Bryant did not hear Condon make these remarks. Sanders Dep. at 47.

Sanders testified that he mentioned the substance of Condon's statements to Bryant but that he did not attribute the information to Condon.[2] *Id.* at 48–49. Sanders also testified that questions about race were central to his conversations with Bryant regarding the selection of an NFL agent.[3] *Id.* at 48. Eventually, Bryant signed with plaintiff and was selected in the second round of the 2002 NFL Draft by the Dallas Cowboys. Schaffer Dep. at 14; Bradley Report at 6.

According to plaintiff, Sanders did not tell him about Condon's comments until Bryant signed a contract with the Dallas Cowboys. Smith Dep. at 38. Sanders corroborated plaintiff's recollection and testified that he did not repeat Condon's remarks to anyone until he met with plaintiff at the Cowboys' training facility in July 2002. Sanders Dep. at 47.

## C. *Recruiting Larry Johnson, Jr.*

In December 2002 and January 2003, plaintiff was competing with other agents for the representation of Larry Johnson, Jr. ("Johnson, Jr."), a highly-touted running back from Pennsylvania State University and prospective professional football player. Compl. ¶ 19. Plaintiff alleges that, in the course of the competition to sign Johnson, Jr., Condon told Larry Johnson, Sr. ("Johnson, Sr.") that plaintiff "played the 'race card' in contract negotiations." *Id.* At that time, Johnson, Sr. was assisting his son in selecting an NFL agent. Johnson Dep. at 63, Pl.Ex. 12.

Plaintiff testified that, at one point in their negotiations, Johnson, Sr. had expressed significant interest in obtaining plaintiff as his son's agent and that Johnson, Jr. "more than likely was going to sign with [plaintiff]." Smith Dep. at 51:17–18. According to plaintiff, that changed after he received a telephone call from Johnson, Sr. in which Johnson, Sr. said he had heard plaintiff used the "race card" in negotiations. *Id.* at 52. Johnson, Sr. refused to reveal the source of the comment to plaintiff. *Id.* at 52–53. However, he testified at his deposition that he heard from someone that plaintiff used the "race card" in negotiations, but "it wasn't [from] Tom Condon. . . ." Johnson Dep. at 34:24.

Johnson, Jr. selected Marvin Demhoff ("Demhoff"), who is not affiliated with

---

**2.** Sanders testified: "I wasn't like, 'Hey, Tom Condon said this.' . . . One thing we looked at was, 'Hey, how about relationships with these general managers? What if they don't like Lamont because he is black . . .' ?" Sanders Dep. at 48:13, 16–18.

**3.** Regarding the issue of race, Sanders testified: "[W]e felt race played a part in all of these decisions . . . most of the general managers are white guys and maybe they don't like Lamont because of that. . . . I know in my mind the comment that Condon made . . . fed into how I presented it to [Bryant]." *Id.* at 48:22–49:3.

plaintiff or defendants, to be his NFL agent. Johnson Dep. at 39. Johnson, Sr. explained that the "race card" comment had little or no effect on his son's decision to choose Demhoff rather than plaintiff. "[Lamont] never sold the idea that Larry [was] important to him. . . . That's what I was looking for. . . . And that never happened." *Id.* at 39: 7–15. Johnson, Jr. was selected in the first round of the 2003 NFL Draft by the Kansas City Chiefs. Bradley Report at 7.

## III. PROCEDURAL HISTORY

Plaintiff filed this action in the Court of Common Pleas in Philadelphia on June 24, 2003. Defendants removed the case on to this Court on August 26, 2003 based on diversity jurisdiction. On October 24, 2003, the Court denied defendants' motion to transfer the case to the Western District of Missouri pursuant to 28 U.S.C. § 1404(a). On March 9, 2005, the Court denied defendants' motion to compel arbitration.

On March 25, 2005, defendants filed a Motion for Summary Judgment. On May 3, 2005, the Court requested additional submissions from the parties with respect to choice of law issues.

## IV. DISCUSSION

### A. *Standard for Summary Judgment*

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue exists if "the evidence is such that a rea-

sonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

"In determining the facts, the court should draw all reasonable inferences in favor of the nonmoving party." *Id.* at 255, 106 S.Ct. 2505; *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir.2004). The nonmoving party, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support a claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982); see also *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (stating that summary judgment must be granted if the evidence is "merely colorable" or "not significantly probative"). In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. However, where the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir. 1987) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

### B. *Choice of Law*

Plaintiff has alleged claims based on events that occurred in three states: Florida, Louisiana,[4] and Pennsylvania. In addition, defendants argue that a fourth state, Colorado, is relevant to the Court's analysis because plaintiff is domiciled there. While the majority of plaintiff's allegations arise out of events in Pennsylvania, some

---

4. Walker signed with IMG in New Orleans, Louisiana following his participation in the Sugar Bowl. Walker Dep. at 45. This event is relevant in determining whether plaintiff's claims relating to Walker are time-barred.

choice of law questions are presented by the geography of the case.

Because the Court's jurisdiction is based upon diversity of citizenship, the Court must apply the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, Pennsylvania law controls all substantive issues. For *Erie* purposes, statutes of limitations are substantive. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Dixon Ticonderoga Co. v. Estate of O'Connor,* 248 F.3d 151, 160–61 (3d Cir. 2001). When claims arise out of events that took place in another state (not the forum), a court sitting in Pennsylvania must refer to Pennsylvania's choice-of-law rules to determine which state's substantive law governs those claims. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Budget Rent–A–Car System, Inc. v. Chappell,* 407 F.3d 166, 169–170 (3d Cir.2005).

## C. *Plaintiff's Claims*

Plaintiff's asserts three counts against defendants in his Complaint. Count I alleges defamation by Condon in incidents involving Bryant, Johnson, Sr., Sanders, and Walker. Compl. ¶¶ 24–28. Count II alleges defamation against IMG under the doctrine of *respondeat superior.* *Id.* ¶¶ 29–33. Count III alleges two instances (Walker and Johnson, Jr.) of interference with prospective contractual relations against both defendants Condon and IMG. *Id.* ¶¶ 34–39.

For purposes of this analysis, the Court will separately address plaintiff's five claims—three of defamation and two of interference with prospective contractual relations. Based on the discussion below, the Court grants defendants' motion for summary judgment on four of those five claims. With respect to plaintiff's claim of defamation involving Bryant and Sanders, defendants' motion is denied in part.

### 1. *Defamation of Plaintiff to Kenyatta Walker*

██ Defendants argue that plaintiff's claim of defamation to Kenyatta Walker is barred by the applicable statute of limitations. Def. Mot. at 5. Defendants contend that, because the conduct occurred, if at all, in or around November or December 2000 and the instant action was not commenced until June 2003, this claim was not timely filed within either Pennsylvania or Colorado's one-year statute of limitations period for defamation claims.[5] *Id.* Plaintiff responds that, because Condon defamed plaintiff to Walker during a meeting in Florida, Florida's two-year statute of limitations should govern this defamation claim and that the claim was timely filed, because Condon's conduct amounts to a "continuing tort." *Id.* at 15. It is plaintiff's position that the continuing tort analysis is appropriate because Condon made similar remarks to other persons in January 2002 and December 2002 or January 2003. *Id.* In their reply, defendants dispute plaintiff's argument that Florida law governs this claim and assert that, prior to filing Plaintiff's Opposition to the Motion for Summary Judgment, "plaintiff ha[d] never suggested that Florida was the situs of any alleged defamation. . . ." Def. Reply at 2.

### (a) Applicable Statute of Limitations

The Court concludes that plaintiff's claim of defamation to Walker is barred by Pennsylvania's one-year statute of limitations. *See* 42 Pa.C.S.A. § 5523(1) (2004). The parties do not dispute when the re-

---

5. Defendants argue that either Pennsylvania or Colorado's one-year statute of limitations period applies because plaintiff is a resident of Colorado and the publication of Condon's alleged defamatory statements to Walker occurred in Pennsylvania. Def. Mot. at 5 n. 7.

mark at issue allegedly was made. Both agree that Condon spoke to Walker about plaintiff, if at all, in November or December 2000. Def. Mot. at 5; Pl. Opp. at 3–4. The parties do dispute the place of publication. Defendants contend that, based on plaintiff's allegations, Condon's statement was made in Pennsylvania. Memo of Def. at 1–2. Plaintiff argues that Condon defamed plaintiff to Walker in Florida. Pl. Opp. at 11–12. The Court concludes that this dispute is not material because, under either scenario, plaintiff's claim is barred by Pennsylvania's one-year statute of limitations for defamation claims.

Under defendants' theory that the tort occurred in Pennsylvania, the Court must apply Pennsylvania's statute of limitations. Because the alleged statement was made in November or December 2000 and the instant action was not filed until June 2003, this claim is time-barred by Pennsylvania's one-year statute of limitations period for defamation claims. 42 Pa.C.S.A. § 5523(1). Under plaintiff's theory that the tort occurred in Florida, the Court must apply the Uniform Statute of Limitations on Foreign Claims Act ("USLFCA"), 42 Pa.C.S.A. § 5521(b) (2004), which has been adopted in Pennsylvania. According to the USLFCA, "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, *whichever* first bars

the claim." *Id.* (emphasis added). As noted above, the relevant Pennsylvania period is one year. Under Florida law, claims of defamation are subject to a two-year statute of limitations period. West's F.S.A. § 95.11(4)(g) (2002). Because Pennsylvania's limitations period is shorter, the Court must apply Pennsylvania's statute of limitations.[6]

Plaintiff commenced this action in June 2003, more than two years after the alleged tort occurred. Therefore, under either party's choice of law argument, plaintiff's claim is time-barred by Pennsylvania's one-year statute of limitations for defamation claims.

(b) Continuing Tort

In concluding that this claim is time-barred, the Court rejects plaintiff's continuing tort argument. Federal courts "almost universally decline to apply the [continuing tort] doctrine" to defamation claims. *Card v. Pipes*, 398 F.Supp.2d 1126, 1133 (D.Or.2004). "[A] cause of action for defamation accrues immediately upon the occurrence of the tortious act and, thus, is not appropriate for the continuing violation exception." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir.2002) (quoting *Lettis v. U.S. Postal Serv.*, 39 F.Supp.2d 181, 205 (E.D.N.Y.1998)). Even if the Court assumes *arguendo* that plaintiff's allegations are true, the repeated statements do not amount to a continuing tort.[7] "[R]epeated defamations do not

---

6. Because the Court concludes that the factual dispute relating to the place of publication of Condon's alleged statement to Walker is not material, the Court need not engage in any factual analysis nor draw any inferences in favor of plaintiff, the nonmoving party. The Court notes, however, that, based on the record presented, there is substantial evidence that Condon's alleged statements to Walker were made in Gainesville, Florida. That evidence includes the fact that Walker was a student at the University of Florida at

that time, Anderson called Walker in Florida on the day after Walker met with Condon, and Condon met with Walker at least once in Florida. Walker Dep. at 13; Anderson Dep. at 68; Condon Dep. at 45.

7. In addition to the three incidents mentioned in the Complaint, plaintiff has alleged that Condon may have made similar comments to other players and prospects. Compl. ¶ 21. Plaintiff has produced evidence of defamation to Walker and Sanders as well as Grant Wistrom, another prospective professional foot-

constitute a continuing tort; rather, as courts have uniformly recognized, each separate defamatory statement itself constitutes a separate and distinct cause of action." *Lewis v. Gupta*, 54 F.Supp.2d 611, 616 (E.D.Va.1999); *see also Celli v. Shoell*, 995 F.Supp. 1337, 1345 (D.Utah 1998) (holding that each alleged defamatory statement constitutes a distinct cause of action).

## 2. *Defamation of Plaintiff to Antonio Bryant and Charles Sanders*

Plaintiff alleges that Condon defamed plaintiff to Bryant and Sanders. Compl. ¶ 16. Plaintiff, however, has acknowledged that paragraph 16 of the Complaint contains a drafting error, because Bryant did not hear Condon's alleged remarks. Smith Dep. at 39. Sanders also testified that Bryant was not present when Condon made the alleged defamatory remarks. Sanders Dep. at 47. Therefore, the Court grants defendants' motion for summary judgment with respect to Bryant and will analyze this claim as defamation of plaintiff to Sanders only.

Defendants assert that plaintiff's claim of defamation to Sanders fails for two reasons. First, defendants contend that the claim is barred by Pennsylvania's one-year statute of limitations for defamation claims. Memo. of Def. at 1. Second, defendants argue that plaintiff has failed to make a *prima facie* showing of defamation. Def. Mot. at 6–9. The Court will address each of these arguments in turn.

### (a) Statute of Limitations

Defendants argue that this defamation claim is barred by Pennsylvania's one-year statute of limitations. Defendants' argument is based on the fact that Condon met with Sanders and Bryant in January 2002,

that, according to plaintiff, Condon made the alleged defamatory remarks during the meeting, and that plaintiff did not commence this action until June 2003. Therefore, according to defendants, plaintiff's claim is time-barred because the action was commenced more than a year after the alleged incident. Memo. of Def. at 1.

Plaintiff asserts that he did not learn of Condon's remarks to Sanders until July 2002 and that he could not, through the exercise of reasonable diligence, have become aware of the statements prior to that time. Based on these facts, plaintiff argues that the "discovery rule" should be applied to toll the statute of limitations and the claim should be deemed timely filed, because plaintiff commenced this action within a year of discovering his injuries. Pl. Opp. at 17.

■ The Court must decide whether the discovery rule is applicable to plaintiff's claim because it is a limited exception to the bar of the statute of limitations. The discovery rule provides that:

> where the existence of the injury is not known to the complaining party and such knowledge cannot be reasonably ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible.

*Gatling v. Eaton Corp.*, 807 A.2d 283, 289 (Pa.Super.2002). A court's application of the discovery rule arises out of an "inability of a [plaintiff], despite the exercise of due diligence, to know the injury or its cause." *Pocono International Raceway v. Pocono Produce*, 503 Pa. 80, 468 A.2d 468, 471 (1983). As an equitable remedy, the discovery rule should be applied only when appropriate and necessary. "Although the

ball player. Schaffer Dep. at 14–16. These incidents, when viewed together, do not

amount to a continuing tort.

purpose of this rule is 'to mitigate ... the harshness of [a] ... rigid period of limitations,' it is also true that the rule 'cannot be applied so loosely as to nullify the purpose for which a statute of limitations exists.'" *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164, 167 (1997) (quoting *Ingenito v. AC & S, Inc.,* 430 Pa.Super. 129, 633 A.2d 1172, 1175 (1993)).

■ Several courts have applied the discovery rule to defamation claims arising under Pennsylvania law. See, *e.g., Gallucci v. Phillips & Jacobs, Inc.,* 418 Pa.Super. 306, 614 A.2d 284 (1992), *app. denied,* 533 Pa. 660, 625 A.2d 1193 (1993). In *Gallucci,* the Superior Court affirmed the trial court's decision to apply the discovery rule where the plaintiff asserted a defamation claim against his employer based on the employer's secret communications with the Federal Bureau of Investigation. *Id.* at 288. See also *Barron v. Saint Joseph's University,* 2002 WL 32345690, at *8 (E.D.Pa. Jan.17, 2002) (applying discovery rule to defamation claim arising out of remarks made by former employer); *Giusto v. Ashland Chemical Co.,* 994 F.Supp. 587, 594 (E.D.Pa.1998) (DuBois, J.) (concluding that discovery rule was applicable to defamation claim arising out of remarks made by former co-worker).

The Court is aware of two decisions from this district in which judges declined to apply the discovery rule to defamation claims, but both of those cases can be distinguished. See *Barrett v. Catacombs,* 64 F.Supp.2d 440 (E.D.Pa.1999) (Van Antwerpen, J.); *Bradford v. American Media Operations, Inc.,* 882 F.Supp. 1508 (E.D.Pa.1995) (Dalzell, J.). Both *Barrett* and *Bradford* concerned defamation claims based on written statements that were widely circulated at the moment of publication, which made the plaintiffs' discovery of their injuries possible with the exercise of due diligence. In this case, based on the record presented, the alleged defama-tion arises out of a private conversation between Condon and Sanders. Sanders Dep. at 36, 47. In addition, on the present state of the record, it appears that plaintiff had little or no reason to suspect that Condon had defamed him to Sanders because Bryant signed with plaintiff and Sanders, at least initially, did not repeat Condon's comments to anyone. Sanders Dep. at 47; Smith Dep. at 38. The Court, therefore, concludes that plaintiff has presented sufficient evidence that he could not have known of his injuries, despite the exercise of due diligence, to support the application of the discovery rule to this claim. Because there is a genuine issue of material fact as to the timing of plaintiff's discovery of his injuries, a jury must decide whether plaintiff knew or reasonably should have known about Condon's remarks to Sanders more than one year before suit was instituted on June 24, 2003.

(b) Plaintiff's *Prima Facie* Showing: Elements of a Defamation Claim

Defendants argue that plaintiff has failed to make a *prima facie* showing of the claim of defamation to Sanders. Def. Mot. at 6–9. That argument is based on the fact that Sanders served as an advisor to Bryant and that any repetition of Condon's statements to Bryant was of no legal consequence because Bryant selected plaintiff to serve as his NFL agent. *Id.* at 7. Also, defendants contend that the alleged remarks cannot be defamatory, as a matter of law, because Sanders understood Condon's remarks to be statements of opinion rather than of fact. *Id.* at 7–8. Plaintiff responds that Condon's remarks constitute slander *per* se and that he has suffered general damages due to harm to his business reputation. Pl. Opp. at 19. Plaintiff also argues that Sanders understood Condon's remarks to be statements of fact and not opinion. *Id.*

■ A cause of action for most defamations exists only where a plaintiff successfully establishes: (1) the defamatory character of the communication, (2) its publication by the defendant, (3) its application to the plaintiff, (4) the understanding by the recipient of its defamatory meaning, (5) the understanding by the recipient of it as intended to be applied to the plaintiff, (6) special harm resulting to the plaintiff from its publication, and (7) abuse of a conditionally privileged occasion. 42 Pa.C.S.A. § 8343(a) (1998). Pennsylvania recognizes an exception to the requirement of showing special harm where the words spoken constitute slander per se. *Clemente v. Espinosa,* 749 F.Supp. 672, 677 (E.D.Pa.1990). Slander per se can be "words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Id.* (citing Restatement (Second) of Torts § 570 (1977)).

While a plaintiff in a slander *per se* action need not make a showing of special damages, he or she must demonstrate general damages caused by the statement. *Synygy, Inc. v. Scott–Levin, Inc.,* 51 F.Supp.2d 570, 581 (E.D.Pa.1999); see also *Pennoyer v. Marriott Hotel Services, Inc.,* 324 F.Supp.2d 614, 619 (E.D.Pa.2004) ("The Restatement (Second) of Torts requires a victim of slander *per se* to make some showing of general damages...."); *Pyle v. Meritor Sav. Bank,* 1996 WL 115048, at *3 (E.D.Pa. Mar.13, 1996) ("In a defamation per se case ... a plaintiff must prove general damages from a defamatory publication and cannot rely upon presumed damages"); *Protocomm Corp. v. Fluent, Inc.,* 1994 WL 719674, at *11 (E.D.Pa. Dec.27, 1994).[8]

The Court will analyze the evidence presented to support each element in turn.

(1) Defamatory Meaning

■ It is the role of the Court to determine whether the statements at issue are capable of a defamatory meaning. *Corabi v. Curtis Publ'g Co.,* 441 Pa. 432, 273 A.2d 899 (1971). Under Pennsylvania law, a statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Cosgrove Studio & Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751, 753 (1962). To make this determination, the Court "must consider not only the language of the statements, but also the context in which they were published." *Clemente,* 749 F.Supp. at 676 (citing *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 502 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978)). The Court must also "evaluate 'the effect [the statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Tucker v. Fischbein,* 237 F.3d 275, 282 (3d Cir.), cert. denied, 534 U.S. 815, 122 S.Ct. 42, 151 L.Ed.2d 15 (2001) (quoting *Corabi,* 273 A.2d at 907).

The Court concludes that Condon's alleged statements accusing plaintiff, another NFL agent, of injecting race into contract negotiations with NFL clubs are capable of defamatory meaning. Plaintiff states the "race card" comments were made at a time when several agents were competing to provide services to

---

8. The Eastern District of Pennsylvania decisions cited above have followed the rule established in *Walker v. Grand Central Sanitation, Inc.,* 430 Pa.Super. 236, 634 A.2d 237 (1993). In *Walker,* the Pennsylvania Superior Court concluded that Pennsylvania law follows § 621 of the Restatement (Second) of Torts in requiring plaintiffs, when asserting slander *per se* claims, to produce evidence of general damages. *Walker,* 634 A.2d at 244.

Bryant. These remarks were made (if at all) for the purpose of dissuading Bryant (by influencing Sanders's opinion of plaintiff) from signing with plaintiff and raised concerns about plaintiff's ability to negotiate with NFL general managers. As plaintiff's expert reports explain, accusations of the inappropriate use of race in conjunction with contract negotiations are devastating to an agent's reputation. One report states:

> It would be a crippling impediment for any agent to be seen as generally disfavored by the management of NFL clubs and if that disfavor is premised on the belief that a black agent is antagonizing management by improperly interjecting race into negotiations, it is my opinion that player/clients will seek representation elsewhere.

Expert Report of William L. Strickland at 2, Pl.Ex. 4; *see also* Expert Report of Rick E. Smith, Pl.Ex. 3. Thus, the Court concludes that Condon's alleged remarks would cause others to question plaintiff's integrity in his business dealings with NFL clubs and would deter prospective professional football players from associating with plaintiff.

In making this determinating, the Court also rejects defendants' argument that Condon's alleged remarks "were pure expressions of opinion" and, therefore, incapable of a defamatory meaning. Def. Mot. at 8. It is true that expressions of opinion are not actionable unless they imply undisclosed, false and defamatory facts. *Bealer v. Mutual Fire, Marine and Inland Ins. Co.*, 2005 WL 1819971, at *6 (E.D.Pa. Aug.1, 2005) (citing *Parano v. O'Connor*, 433 Pa.Super. 570, 641 A.2d 607, 609 (1994)); see also Restatement (Second) of Torts § 566 (1977). But the evidence presented does not support defendants' contention that Condon was expressing an opinion. According to Sanders's testimony, Condon told him that: "[plaintiff] plays the race card and a lot of the general managers are getting tired of that. I know the guy at Tennessee is tired of it, and, you know, that's not a good thing." Sanders Dep. at 45:13–15. While Condon may have added his opinion by noting "that's not a good thing," Condon's alleged remarks to Sanders are statements of fact that plaintiff plays the "race card" in negotiating with NFL clubs and that many general managers disapprove of that tactic; they do more than imply defamatory facts, they expressly state such facts.

#### (2) Slander *Per Se*

■ Next, the Court must determine whether Condon's alleged remarks fall within the business misconduct category of slander *per se*. A statement is slanderous *per se* as an accusation of business misconduct if it " 'ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of lawful business.' " *Clemente*, 749 F.Supp. at 677–678 (quoting Restatement (Second) of Torts § 573 (1977)). The statement must be "peculiarly harmful to one engaged in [that] business or profession. Disparagement of a general character, equally discreditable to all persons, is not enough. . . ." *Id.* at 678 (quoting Restatement (Second) of Torts § 573, Comment e). Comment e continues by stating that a conclusion of slander *per* se is appropriate if "the particular quality disparaged . . . is peculiarly valuable in plaintiff's business or profession." Restatement (Second) of Torts § 573, Comment e.

■ The Court concludes that Condon's alleged remarks to Sanders constitute slander *per se*. These comments are "peculiarly harmful" to plaintiff because his ability to represent professional football players is directly tied to his relationships with the general managers of NFL clubs. Since Condon's alleged remarks ascribe to plaintiff conduct that would adversely affect his fitness to conduct properly his

duties as an agent, they constitute slander *per se.*

### (3) Evidence of General Damages

■ Based on the foregoing conclusion that Condon's alleged remarks to Sanders constitute slander *per se,* the Court must determine whether plaintiff has produced evidence of general damages. General damages can derive from "impairment of reputation and standing in the community, personal humiliation, [or] mental anguish and suffering." *Sprague v. Am. Bar Ass'n,* 276 F.Supp.2d 365, 368 (E.D.Pa. 2003) (quoting *Marcone v. Penthouse International Magazine,* 754 F.2d 1072, 1079 (3d Cir.1985)).

Defendants contend that plaintiff has failed to demonstrate any general damages, because the remark had no affect on plaintiff's business relationship with Bryant. Def. Mot. at 9. But defendants' argument is misplaced. Plaintiff is not required to demonstrate special damages or pecuniary harm (i.e., that Bryant signed with another agent) due to Condon's alleged remarks to Sanders, because they amount to slander *per se.* Moreover, the Court finds evidence of general damages based on the harm caused to plaintiff's reputation and personal anguish allegedly suffered by plaintiff.

The evidence of harm to plaintiff's reputation is found in Sanders's deposition. Sanders testified that he considered Condon's statements to be "derogatory" but was not surprised to hear such comments uttered by another agent. Sanders Dep. at 45–46. "[Condon] is trying to say what he can do better and how he can help, he got a better relationship with general managers." *Id.* at 46:3–6. Sanders also testified that he mentioned the substance of Condon's statements to Bryant but did not attribute the information to Condon. *Id.* at 48–49. He added that "I know in my mind the comment that Condon made … fed into how I presented it to [Bryant]." *Id.* at 49:1–3. When asked how important it is that an agent have a good relationship with general managers, Sanders responded, "It's important, very important." *Id.* at 111:22. Then, in a follow-up question, Sanders was asked whether the revelation that an agent had problems with a general manager would be cause for concern in selecting that agent. Sanders responded, "Yeah, absolutely. Yes." *Id.* at 112: 4. Based on this testimony, the Court finds that plaintiff has provided evidence of reputational harm, because Condon's alleged remarks affected Sanders's opinion of plaintiff, namely plaintiff's ability to effectively represent Bryant in contract negotiations with NFL clubs.[9]

Plaintiff has also presented evidence of personal anguish based on the concern that Condon's remarks caused him. Plaintiff testified that, upon learning of Condon's statements to Sanders, he called Tennessee Titans general manager Floyd Reece to determine whether Condon's remarks were an accurate depiction of plaintiff's reputation throughout the NFL. Smith Dep. at 37–38. Plaintiff stated:

I then, after being advised of that, called Floyd Reece and asked him, said, listen, there's something that's floating around here and I want to clarify something. I said, do you have any recollection of our discussions surrounding race, has race ever been an issue in any of our discussions that you can recall? And he laughed and said, well, we've talked about a lot of things and had a lot of battles, but race sure isn't one of them.

*Id.* at 38: 5–13. Plaintiff added that he "revisited the issue" with Reece in the

---

9. The Court need not rule on whether Sanders's repetition of the substance of Condon's alleged remarks to Bryant, even if never attributed to Condon, caused any damage to plaintiff.

spring of 2004 "just to make sure." *Id.* at 41. Plaintiff also testified that he mentioned Condon's comments to David Ware, an agent based in Atlanta. *Id.* In sum, plaintiff's testimony provides evidence of personal anguish caused by the revelation of Condon's comments because plaintiff responded by trying to allay his concerns by speaking with Reece, the Titans' general manager, at least twice.

### (4) Evidence of All Other Elements of Defamation

The Court also concludes that plaintiff has produced sufficient evidence to demonstrate all of the other elements of the claim of defamation to Sanders. With respect to the second element, plaintiff has offered sufficient evidence to demonstrate publication based on Sanders's testimony that Condon made the alleged remarks to him. Sanders Dep. at 45–46. Third, the alleged statements made by Condon clearly applied to plaintiff, because Condon mentioned plaintiff in the statements. *Id.* With respect to the fourth element, defendants argue that Sanders understood the comments to be "mere 'puffing' by an agent to increase his chances of being selected by the player." Def. Mot. at 7. However, Sanders stated that he understood the defamatory nature of Condon's remarks. "I looked at it as a negative . . . . I thought it was a derogatory statement to make about [plaintiff] . . . ." Sanders Dep. at 45: 21, 24–25. Thus, there is evidence to support a finding that Sanders understood the defamatory meaning of Condon's alleged remarks. Fifth, the evidence presented supports a finding that Sanders understood that Condon's alleged remarks applied to plaintiff, because Sanders later repeated the comments to plaintiff. *Id.* at 47. Finally, the seventh element is not at issue because defendants have not asserted any privileges in defense of this claim. Therefore, plaintiff has produced evidence to support all elements of this claim.

Based on the foregoing analysis, the Court concludes that plaintiff has provided sufficient evidence to support each element of the claim of defamation to Sanders. Because there are genuine issues of material fact, the Court denies defendants' motion for summary judgment with respect to this claim.

### 3. *Defamation of Plaintiff to Larry Johnson, Sr.*

Defendant's motion for summary judgment is granted with respect to the claim of defamation to Larry Johnson, Sr. because plaintiff has failed to provide evidence to support the claim. According to Johnson, Sr., Condon never made any remarks about plaintiff's use of the "race card" to him. To the contrary, Johnson, Sr. testified that he had heard from an unidentified person that plaintiff used the "race card" in negotiations; he said Condon was not the source of that information. Johnson Dep. at 34. Moreover, plaintiff admitted at his deposition that, contrary to paragraph 19 of the Complaint, plaintiff does not know who told Johnson, Sr. that plaintiff used the "race card" in contract negotiations. Smith Dep. at 53.

### 4. *Interference with Prospective Contractual Relations with Kenyatta Walker*

■ The Court grants defendants' motion for summary judgment with respect to plaintiff's claim of interference with prospective contractual relations with Kenyatta Walker because the claim is time-barred by Pennsylvania's two-year statute of limitations. See 42 Pa. C. S.A. § 5524(7) (2004).[10]

---

**10.** Section 5524(7) provides, in relevant part, that "[a]ny other action or proceeding to re-

cover damages for injury to person or property which is founded on negligent, intentional,

As noted above (Section IV.C.1, *supra),* the parties do not dispute the date of the alleged incident, but they do dispute the place of the incident. Plaintiff argues that the alleged defamation to Walker occurred in Florida, while defendants contend that any conversation with Walker took place in Pennsylvania. Once again, however, the Court concludes that the dispute over the place of the incident is not material. Because Florida's statute of limitations for interference with prospective contractual relations is four years, West's F.S.A. § 95.11(3)(*o*),[11] the Court must apply Pennsylvania's two-year period under either scenario. See 42 Pa.C.S.A. § 5521(b).

To determine the timeliness of plaintiff's claim, the Court must decide when plaintiff's claim accrued. Under Pennsylvania law, "[a] cause of action arises and the statute of limitations begins to run upon the occurrence of the final significant event necessary to make the claim suable." *Merv Swing Agency, Inc. v. Graham Co.,* 579 F.Supp. 429, 430 (E.D.Pa.1983) (citing *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.,* 372 F.2d 18, 20 (3d Cir.1966), cert. *denied,* 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967)). The tort of interference of prospective contractual relations requires a showing of damages under both Florida and Pennsylvania law. See *Jay v. Mobley,* 783 So.2d 297, 299 (4th DCA 2001) (applying Florida law); *Milicic v. Basketball Marketing Co., Inc.,* 857 A.2d 689, 697 n. 4 (Pa.Super.Ct.2004) (applying Pennsylvania law).

When Walker signed with IMG in January 2001, plaintiff would have been able to demonstrate damages. Thus, Walker's signing with IMG was the "final significant event" for statute of limitations purposes. Because plaintiff filed this action in June 2003, more than two years after "... the final significant event necessary to make the claim suable ..." the claim is time-barred. *Merv Swing Agency,* 579 F.Supp. at 430.

### 5. Interference with Prospective Contractual Relations with Larry Johnson, Jr.

Defendants' motion for summary judgment with respect to plaintiff's claim of interference with prospective contractual relations with Larry Johnson, Jr. is granted because plaintiff has conceded that the evidence presented does not support this claim. Pl. Opp. at 9.

## V. CONCLUSION

The Court grants Defendants' Motion for Summary Judgment with respect to all of plaintiff's claims excepting plaintiff's claim of defamation to Sanders. As to that claim, the parties have presented genuine issues of material fact.

An appropriate order follows.

### ORDER

**AND NOW,** this 7th day of June 2006, upon consideration of Motion for Summary Judgment of Defendants, Thomas J. Condon and IMG Worldwide, Inc. (Document

---

or otherwise tortious conduct ... except an action or proceeding subject to another limitation specified in this subchapter" must be commenced within two years. 42 Pa.C.S.A. § 5524(7).

**11.** Section 95.11(3)(*o*) provides that "[a]n action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any intentional tort,

except as provided in subsections (4), (5), or (7)" must be commenced within four years. West's F.S.A. § 95.11(3)(*o*). Subsection (4) is not applicable and lists all actions that must be commenced within two years; subsection (5) is also not applicable and lists all actions that must be commenced within one year; and subsection (7) is not applicable because it pertains to intentional torts based on abuse. West's F.S.A. §§ 95.11(4)-(5), (7).

No. 31, filed March 25, 2005), Plaintiff's Opposition to the Motion for Summary Judgment of Defendants Thomas J. Condon and IMG Worldwide, Inc. (Document No. 32, filed April 18, 2005), Reply Memorandum of Defendants, Thomas J. Condon and IMG Worldwide, Inc. in Support of Their Motion for Summary Judgment (Document No. 34, filed April 29, 2005), Plaintiff's Supplemental Memorandum Addressing Choice of Law Issues in Opposition to the Motion for Summary Judgment of Defendants Thomas J. Condon and IMG Worldwide, Inc. (Document No. 36, filed May 13, 2005), Memorandum of Defendants, Thomas J. Condon and IMG Worldwide, Inc. With Respect to Choice of Law (Document No. 37, filed May 20, 2005), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** as follows:

1. Defendants' Motion for Summary Judgment as to plaintiff's claim of defamation to Kenyatta Walker is **GRANTED;**

2. Defendants' Motion for Summary Judgment as to plaintiff's claim of defamation to Antonio Bryant and Charles Sanders is **GRANTED** as to the defamation to Bryant and **DENIED** as to the defamation to Sanders;

3. Defendants' Motion for Summary Judgment as to plaintiff's claim of defamation to Larry Johnson, Sr. is **GRANTED;**

4. Defendants' Motion for Summary Judgment as to plaintiff's claim of interference with prospective contractual relations with Kenyatta Walker is **GRANTED;** and

5. Defendants' Motion for Summary Judgment as to plaintiff's claim of interference with prospective contractual relations with Larry Johnson, Jr. is **GRANTED.**